UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAY MARCUS,

               Plaintiff,

        - against -

MARIE MICHELINE LOMINY and PEDIATRIC
ADOLESCENT MEDICINE LLC.

               Defendants.

           18-CV-1857 (NSR) (LMS)

## MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND IN
## OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO
## FEDERAL RULE OF CIVIL PROCEDURE 56

Joan M. Gilbride
KAUFMAN BORGEEST & RYAN LLP
120 Broadway, 14th Floor
New York, New York 10271
Telephone: 212.980.9600
Facsimile: 212.980.9291

6644041

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT**................................................................................1

**STATEMENT OF FACTS**...................................................................................2

    A. Background regarding Dr. Lominy, PAM and the beginning of the relationship
       between  Dr. Lominy and Mr. Marcus.................................................................2

    B. The So-Called "Investment" By Mr. Marcus into PAM ..................................4

    C. PAM's Operation for Nine Years .................................................................4

    D. Dr. Lominy Becomes an Employee of BCHP ..............................................6

**STANDARD OF LAW**........................................................................................7

**ARGUMENT** ....................................................................................................8

**POINT I**
**PLAINTIFF FAILS TO ESTABLISH ESSENTIAL ELEMENTS OF A BREACH OF CONTRACT**
**CAUSE OF ACTION**...........................................................................................8

    A. The Alleged Oral Agreement is an Illegal Contract that Cannot be Enforced..............9

    B. The Alleged Oral Agreement is Unenforceable .........................................13

    C. The Purported Oral Contract is Barred by the Statute of Frauds ...............16

        i. The Purported Agreement Could Not be Performed Within One Yea*r*.............16

**POINT II**
**PLAINTIFF IS NOT ENTITLED TO EQUITABLE RELIEF** ......................................17

    A. Plaintiff's Claims for Equitable Relief Are Barred By the Doctrine of Unclean
       Hands ..........................................................................................................17

    B. There are No Disputes of Material Fact in Connection with Plaintiff's Quantum
       Meruit and Unjust Enrichment Causes of Action ..........................................18

    C. Plaintiff's Causes of Action for Unjust Enrichment is Duplicative of his Breach
       of Contract Cause of Action .........................................................................19

    D. Plaintiff Cannot Recover Under a Promissory Estoppel Theory.................19

**POINT III**
**PLAINTIFF'S WAGE AND HOUR CLAIMS ARE MERITLESS** ................................20

    A. Plaintiff Fails to Show FLSA Coverage......................................................20

       1. There is no Enterprise Coverage under the FLSA...........................21

i

2. There is No Individual Coverage under the FLSA ...........................................21

B. Plaintiff is Exempt from FLSA Overtime ....................................................................23

1. Plaintiff is an Exempt Administrative Employee Under the FLSA and NYLL .....................................................................................................................23

i.   It is Undisputed that Plaintiff Received Sufficient Compensation to Qualify as  Administratively Exempt under the FLSA and NYLL. ............24

ii.  Plaintiff's Work was Directly Related to the Management and General Business Operations of PAM. ...............................................................25

iii. Plaintiff Exercised Discretion and Independent Judgment. ................25

iv. Plaintiff Had Independent Discretion and Judgment on Significant Matters ........................................................................................26

2. Plaintiff is Exempt under the Executive Exemption..........................................26

3. Plaintiff is Exempt Under a Combined Exception ...........................................27

C. Plaintiff Fails to Raise a Triable Issue of Fact on his Wage and Hour Claims............27

D. Plaintiff's Wage and Hour Claims are Time-Barred ....................................................30

**CONCLUSION**.....................................................................................................................30

## TABLE OF AUTHORITIES

Cases

*166 Mamaroneck Ave. Corp v. 151 E. Post Rd. Corp.*,
78 N.Y.2d 88 (1991).................................................................................................15

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946).................................................................................................28

*Archie v. Grand Cent. P'ship, Inc.*,
997 F.Supp. 504 (S.D.N.Y.1998) ...........................................................................21

*Arentz v. Morse Dry Dock & Repair Co.*,
249 N.Y. 439 (1928).........................................................................................14, 15

*Baliotti v. Walkes*,
115 A.D.2d 581 (2d Dep't 1985)..............................................................................11

*Bloch v. Gerdis*, No. 10 Civ. 5144 (PKC)(AJP),
 2011 WL 6003928 (S.D.N.Y. Nov. 30, 2011)........................................................15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................................. 8

*Colella v. City of New York*,
986 F.Supp.2d 320 (S.D.N.Y 2013).........................................................................30

*Delaney v. Bank of Am. Corp.*,
908 F. Supp. 2d 498 (S.D.N.Y. 2012),................................................................8, 14

*Dent v. Giaimo*,
606 F. Supp. 2d 1357 (S.D. Fla. 2009)....................................................................22

*Durso v. Baisch*,
37 A.D.3d 646 (2d Dep't. 2007) ..............................................................................14

*Express Ind. and Terminal Corp. v. New York State Dept of Transp.*,
93 N.Y.2d 584  (N.Y. 1999).....................................................................................14

*Genger v. Genger*,
76 F. Supp. 3d 488 (S.D.N.Y. 2015),.......................................................................20

*Goldstein v. Delgratia Min. Co.*,
176 F.R.D. 454 (S.D.N.Y. 1997)..............................................................................18

*Gutkowski v. Steinbrenner*,
680 F. Supp. 2d 602 (S.D.N.Y. 2010).................................................................15, 18

6642649

*Hartman v. Bell*,
137 A.D.2d 585 (2d Dep't 1988)..............................................................................11

*Jian Long Li v. Li Qin Zhao*,
 35 F. Supp. 3d 300 (E.D.N.Y. 2014)...............................................20, 21, 22, 23

*Kolchins v. Evolution Markets, Inc.*,
128 A.D.3d 47 (1st Dep't 2015)...............................................................................13

*Kowalchuk v. Stroup,* 61 A.D.3d 118, 121 (1st Dep't 2009)
61 A.D. 3d 118 (1st Dep't 2009)…………………………………………………13

*Kreiss v. McCown DeLeeuw & Co.*,
37 F. Supp. 2d 294 (S.D.N.Y. 1999).......................................................................18

*Krumholz v. Village of Northport*,
873 F. Supp. 2d 481 (E.D.N.Y. 2012).....................................................................23

*Kuebel v. Black & Decker Inc.*,
643 F.3d 352 (2d Cir. 2011).....................................................................................29

*Laugh Factory Inc. v. Basciano*,
608 F.Supp.2d 549 (S.D.N.Y.2009).........................................................................17

*Lia v. Saporito*,
909 F. Supp. 2d 149 (E.D.N.Y. 2012).....................................................................17

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*,
879 F. Supp. 2d 243 (E.D.N.Y. 2012).....................................................................12

*Linchitz Practice Mgmt., Inc. v. Daat Med. Mgmt., LLC*,
165 A.D.3d 908 (2d Dep't 2018).........................................................................9, 10

*LoMagno v. Koh*,
246 A.D.2d 579 (2d Dep't 1998).............................................................................. 9

*Martin, Delicatessen, Inc. v. Schumacher*,
52 N.Y.2d 105 (N.Y. 1981)......................................................................................14

*Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*,
171 A.D.2d 479 (1st Dep't 1991)..............................................................................18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).................................................................................................. 8

*McCoy v. Edison Price*, Inc.,
186 A.D.2d 442 (1st Dep't 1992)..............................................................................16

*McLeod v. Threlkeld*,
319 U.S. 491 (1943)..................................................................................................21

*Merschrod v. Cornell Univ.*,

iv

6642649

139 A.D.2d 802 (2d Dep't 1988)) ............................................................................................14

*Nelson v. Stanley Blacker, Inc.*,
713 F. Supp. 107 (S.D.N.Y. 1989).........................................................................................18

*Owusu v. Corona Tire Shop, Inc.*,
No. 09–CV–3744, 2013 WL 1680861 (E.D.N.Y. Apr. 17, 2013) ..............................................20

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
324 U.S. 806 (1945)..............................................................................................................17

*Preferred Oncology Networks of Am., Inc. v. Bottino*, No.
96 CV 1898 (BDP), 1997 WL 305253 (S.D.N.Y. May 28, 1997) ...............................................13

*Reddington v. Staten Island Univ. Hosp.*,
511 F.3d 126 (2d Cir. 2007) .................................................................................................15

*Rogowsky v. McGarry*,
55 A.D.3d 815 (2d Dep't 2008).............................................................................................19

*Rooney v. Tyson*,
91 N.Y.2d 685 (1998)............................................................................................................15

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
573 F.3d 98 (2d Cir. 2009); ..................................................................................................16

*S. Shore Neurologic Assocs., P.C. v. Mobile Health Mgmt. Servs., Inc.*,
37 Misc. 3d 1226(A), 964 N.Y.S.2d 63 (Sup. Ct. 2012) ...........................................................13

*S. Shore Neurologic Assocs., P. C. v. Mobile Health Mgmt. Servs., Inc.*,
121 A.D.3d 881 (2014)......................................................................................................11, 13

*Sachs v. Saloshin*,
138 A.D.2d 586 (2d Dep't 1988)............................................................................................17

*Sawyer v. Sickinger*,
47 A.D.2d 291 (1st Dep't 1975)............................................................................................17

*Schmidt v. Eagle Waste & Recycling, Inc.*,
599 F.3d 626 (7th Cir. 2010) ................................................................................................27

*Schwind v. EW & Assocs., Inc.*,
357 F. Supp. 2d 691, 705 (S.D.N.Y. 2005)........................................................................24, 25

*Seltzer v. Dresdner Kleinwort Wasserstein, Inc.*,
356 F. Supp. 2d 288 (S.D.N.Y. 2005).....................................................................................24

*Sheldon Rabin, M.D., P.C. v. Hirschfield*,
223 A.D.2d 535 (2d Dept 1996) ...........................................................................................11

*Silk v. Albino*,
No. 8:06CV33 T23TBM, 2007 WL 853752 (M.D. Fla. Mar. 19, 2007),......................................22

6642649

*Solomatina v. Mikelic*,
370 F. Supp. 3d 420 (S.D.N.Y. 2019),...................................................................19

*Stone v. Freeman*,
298 N.Y. 268 (1948)......................................................................................... 9

*Thorne v. All Restoration Services, Inc.*,
448 F.3d 1264 (11th Cir. 2006) ......................................................................22

*United Calendar Mfg. Corp. v. Huang*,
94 A.D.2d 176 (2d Dep't 1983).........................................................................11

*Yang Li v. Ya Yi Cheng*,
No. 10-CV-4664, 2012 WL 1004852 (E.D.N.Y. Mar. 23, 2012). ...............................21

*Zaitsev v. Salomon Bros.*,
60 F.3d 1001 (2d Cir. 1995) .............................................................................17

Statutes

29 C.F.R. § 541.100(a). ..............................................................................26, 33
29 C.F.R. § 54. 201 .........................................................................................25
29 C.F.R. § 541.602...........................................................................................24
29 C.F.R. § 541.708..........................................................................................27
29 U.S.C. § 203(s)(1)(A) ....................................................................................21
29 U.S.C. §§ 206(a), 207(a)(1)............................................................................20
29 U.S.C. § 255(a)..............................................................................................30
Article 130 of the N.Y. Education Law .................................................................. 9
Article 30, Sub article 3, Section 6509 ................................................................ 9
C.F.R. §§ 779.103.............................................................................................21
C.F.R. 779.104..................................................................................................21
Section 230(a) of the N.Y. Public Health Law.........................................................10
Fair Labor Standards Act ........................................................................... passim
N.Y. Bus. Corp. Law § 1507................................................................................12
N.Y. Educ. Law § 6509 .............................................................................. passim
N.Y. Gen. Oblig. Law § 5-701(a)(10).....................................................................18
New York Education Law § 6530 ...................................................................10, 11
New York Labor Law .................................................................................. passim
New York's General Obligations Law § 5-701 ........................................................16
Sections § 6511 ...............................................................................................10

Rules

Federal. Rule Civil. Procedure. 50......................................................................8, 22

6642649

**PRELIMINARY STATEMENT**

Defendant Dr. Marie Lominy ("Dr. Lominy") invested in her education, graduated from medical school, and worked around-the-clock to pay the bills to start a private medical practice. During a vulnerable time in her life – while ending a difficult marriage – Dr. Lominy met Plaintiff Jay Marcus ("Mr. Marcus"). Dr. Lominy entered into a romantic relationship with Mr. Marcus. They bought a home and lived together with Dr. Lominy's two young children.  Mr. Marcus, whose construction business suffered as a result of the 2008 housing market collapse, offered to assist Dr. Lominy, whom he wanted to marry, with business advice and then began working at her medical practice, describing himself as "Administrator."  After years struggling to establish her practice, while at the same time paying a mortgage and all the expenses of raising two children and not realizing that Mr. Marcus was siphoning off 50% of the practice's profits, Dr. Lominy decided to become an employee of Boston Children's Health Physicians, a large, regional practice that would provide economies of scale and relationships with health care insurers that would allow Dr. Lominy to concentrate on her passion – providing pediatric services to children in her Mount Vernon community.

Mr. Marcus attempts to convince this Court that he is, through a disputed oral agreement, entitled to 50% of Dr. Lominy's revenue for the rest of her life. Such an arrangement was never contemplated, let alone agreed to, by Dr. Lominy, and would constitute unlawful fee-splitting between a physician and non-physician. Even if such an agreement existed, courts will not enforce a contact with such illegal ends. The illegality of the fee-splitting further bars Mr. Marcus' claims for equitable relief.

Mr. Marcus also seeks the "return" of his so-called financial investment into PAM from Dr. Lominy.  This claim is based upon the purported oral agreement as well.  There was no such agreement.  Moreover, the funds that Mr. Marcus claims were his "investment," are documented in four checks, each of which came from a bank account either in Dr. Lominy's name or in the

1

name of a corporate entity solely owned by Dr. Lominy.   The funds were used for a down payment on a home that was purchased and mortgaged in Dr. Lominy's name.

Incredibly, Mr. Marcus who was responsible for payroll processing and finances during his employment at PAM, now claims that he was not paid for hours worked.   He testified unequivocally that it was his decision to keep his salary low and that he was the sole conduit to the payroll processing agency for PAM.   He told PAM employees to keep time records, but never did so himself.   He admitted taking 50% of PAM's profits, although he never reported that income to any taxing authority.   Mr. Marcus has received more than his fair share of compensation for his efforts and his wage claims should be dismissed.

Accordingly, Defendants Marie Micheline Lominy and Pediatric Adolescent Medicine LLC ("PAM")(collectively "Defendants") submit this memorandum of law in support of Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, and in opposition to Plaintiff's motion for summary judgment in connection with each and every cause of action in Plaintiff's Complaint.

## STATEMENT OF FACTS

### A.  Background regarding Dr. Lominy, PAM and the beginning of the relationship between  Dr. Lominy and Mr. Marcus

Dr. Marie Lominy graduated from medical school in Haiti in 1995, becoming a physician.[1] She pursued her dream of becoming a pediatrician after moving to the United States.   She completed a pediatric residency at Lincoln Hospital in 2005.[2]   In 2005, while in a difficult marriage with two young children, she met Plaintiff Jay Marcus.[3]   Mr. Marcus had a construction business and was engaged to work at Dr. Lominy's home.[4]   Mr. Marcus was married, but his wife had begun divorce proceedings, resulting in a divorce process described by Mr. Marcus as

---

[1] Declaration of Marie Micheline Lominy dated August 5, 2020 ("Lominy Decl.") ¶ 3.
[2] Id.
[3] Lominy Decl. ¶ 5
[4] Id.

6642649

"not amicable."[5]  The two began a relationship, with Mr. Marcus asking Dr. Lominy to marry him and giving her an engagement ring.[6]  Mr. Marcus wanted to buy a home together, but asked Dr. Lominy to put the home and mortgage in Dr. Lominy's name only because his "credit was bad."[7] The two pooled money to purchase a home, but Dr. Lominy trusted Mr. Marcus to make financial decisions concerning investing that money.[8] He formed corporations in Dr. Lominy's name, opened savings accounts and moved the money around telling Dr. Lominy he was trying to get the best interest rates.[9]

Dr. Lominy focused on her profession and her goal of opening a private practice.  When Mr. Marcus offered assistance in the form of advice, she trusted him.[10]  She had a relationship with a Haitian physician colleague who offered her the opportunity in 2007 to take over her medical office space, even offering to allow Dr. Lominy to utilize all of the furniture and equipment available in the space, so that there were minimal initial start-up costs.[11]  Dr. Lominy entered into the lease, formed defendant Pediatric Adolescent Medicine LLC (with Mr. Marcus' assistance) and began her private practice.[12]  She took minimal salary in the beginning and kept expenses down.[13]  Rent, a security deposit, incidental supplies, minimal payroll were all that was necessary to start PAM, given the opportunity provided by Dr. Lominy's colleague and other avenues of keeping expenses low.[14]  All during this time, beginning in 2002, Dr. Lominy also worked at Lincoln Hospital to provide revenue to grow and support her private practice.[15] She worked evenings, weekends and all hours to pursue her goal of developing PAM.[16]

---

[5] Declaration of Joan M. Gilbride dated August 6, 2020 ("Gilbride Decl."), Ex. "A," Marcus Deposition Transcript ("Marcus Dep. Tr.") at p. 41:5-7; 46:21-24.
[6] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 122:2-5.
[7] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at 51:13-52:3.
[8] Lominy Decl. ¶ 6.
[9] Id.
[10] Lominy Decl. ¶ 10.
[11] Lominy Decl. ¶ 7.
[12] Declaration of Jay Marcus dated May 19, 2020 ("Marcus Decl."), Ex. "6."
[13] Lominy Decl. ¶ 9.
[14] Id.
[15] Lominy Decl. ¶ 3.
[16] Lominy Decl. ¶ 7.

3

### B. The So-Called "Investment" By Mr. Marcus into PAM

Dr. Lominy and Mr. Marcus pooled money to purchase a home to reside in together along with Dr. Lominy's children when they were both divorced.[17]  Mr. Marcus invested those funds in various accounts in order to garner the best interest rate.[18]  Some of this money is reflected in the four checks that Mr. Marcus points to as his investment into PAM.[19]  Those four checks are all drawn from either Dr. Lominy's account or accounts in the name of an entity solely owned by Dr. Lominy, The PIC of Wall Street ("PIC").[20]  Mr. Marcus apparently decided that it was best to put those funds into accounts opened in the name of PAM when PAM was first formed.[21]  Eventually, almost the exact amount reflected in those checks was withdrawn in 2010, when the house at 15 Fox Run Road in Croton-on-Harmon was purchased.[22]  That house was purchased in Dr. Lominy's name, but then mysteriously transferred to Mr. Marcus's name, although the mortgage always remained in Dr. Lominy's name until the Fox Run house was sold in 2016 (the mortgage was paid off, but any profits on the sale went to Mr. Marcus).[23]  PAM's tax returns reflect an amount that was considered "savings," (in the form of a loan from shareholder) for a couple of years and then a withdrawal of that amount in 2010 when the Fox Run house was purchased.[24]  Of course, a small start-up corporation like PAM would not have savings, unless it was really money being used for another purpose, like savings for a home.

### C. PAM's Operation for Nine Years

PAM was in operation as a small pediatric practice located at 100 Stevens Avenue in Mount Vernon, New York beginning in September 2007 through July 1, 2016.[25]  It never generated revenue of $500,000 and operated as a very small business.[26]  Dr. Lominy saw

---

[17] Lominy Decl. ¶ 5 & 6.
[18] Lominy Decl. ¶ 6.
[19] *See* Gilbride Decl., Ex. "D."
[20] Id.
[21] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 70:9-71:7.
[22] Lominy Decl. ¶ 12 &13.
[23] Lominy Decl. ¶ 12.
[24] Lominy Decl. ¶ 13; Lominy Decl. Ex. "8," Kanner Deposition Transcript ("Kanner Dep. Tr.") at p. 49-54.
[25] Compl. ¶ 42; Lominy Decl. ¶ 21.
[26] Lominy Decl. ¶ 10.

patients during the day and then went to Lincoln Hospital in the evenings and on weekends to generate revenue.[27]   Mr. Marcus became the office manager, or Administrator as he called himself and, unbeknownst to Dr. Lominy, even purportedly created a job description which was shown to Dr. Lominy for the first time during her deposition.[28]   Mr. Marcus supervised the employees, the payroll and all of the daily operations of the practice, other than treating patients.[29]   Mr. Marcus convinced Dr. Lominy to retain his longstanding accountant, Bruce Kanner, not only for PAM, but also for her personal tax returns.[30]   Mr. Marcus maintained and gathered the financial information for the practice which he provided to Mr. Kanner annually, reviewing the tax returns.[31]   Mr. Marcus even made suggestions concerning the corporate form that PAM should take, changing the form several times during its existence.[32]

Dr. Lominy and Mr. Marcus lived together after Dr. Lominy obtained her divorce in 2011 in the Fox Run house until early 2016, when the relationship became estranged.[33]   Dr. Lominy's revenue, generated through PAM and her employment at Lincoln sustained the household throughout that time and even provided the basis for the purchase of a property at 88 West Lincoln Avenue in Mount Vernon, which was to be a new location for PAM and a source of rental income.[34]   Mr. Marcus devoted much time and attention to this project (as well as his other business interests).

Dr. Lominy and Mr. Marcus entered into a written agreement concerning the 88 West Lincoln property, documenting their agreement to share profits and expenses on a 50/50 basis.[35]

---

[27] Lominy Decl. ¶¶ 7 & 8.
[28] Lominy Decl. ¶ 10.
[29] Id.
[30] Lominy Decl. ¶ 18.
[31] Id.
[32] Lominy Decl. ¶ 11.
[33] Lominy Decl. ¶¶ 12 & 22.
[34] Lominy Decl. ¶ 14.
[35] Lominy Decl., Ex. "9," 88 West Lincoln LLC Operating Agreement.

6642649

Dr. Lominy trusted Mr. Marcus to pay PAM's employees in accordance with the law, including himself.[36]   Mr. Marcus never kept time records and, as far as Dr. Lominy knew, was paying himself appropriately for the hours he worked on behalf of PAM.[37]

Unbeknownst to Dr. Lominy, Mr. Marcus was taking 50% of PAM's profits for himself, based upon his own calculations.[38]   Not surprisingly, at some point, as the expenses seemed to never end and Dr. Lominy's life was not getting any easier, she decided to become an employee of a larger organization.[39]   Although he initially introduced the idea, Mr. Marcus was not happy about it when he realized that this entity would only negotiate with Dr. Lominy, since Mr. Marcus was not a physician.[40]   At about this time, the personal relationship between the two began to deteriorate, and in early 2016, Dr. Lominy moved out of the Fox Run house.[41]   This coincides with Mr. Marcus's unilateral decision to increase his hourly rate from $15 an hour to $75 an hour.[42]

### D.  Dr. Lominy Becomes an Employee of BCHP

Dr. Lominy became an employee of Boston Children's Health Physician's ("BCHP") effective July 1, 2016.[43]   PAM's employees all became employees of BCHP as of that date, with the exception of Mr. Marcus.[44]   Mr. Marcus declined Dr. Lominy's offer to become an employee of BCHP.[45]   Instead, he proceeded to come to Dr. Lominy's office every day after July 1, 2016 until October 23, 2016, sitting at a computer with no work to do, knowing full well that PAM was no longer operational.[46]   Mr. Marcus was involved during the entire transfer of operations to BCHP, providing financial data, enabling the transfer of computer-stored information and

---

[36] Lominy Decl. ¶ 11 & 19; Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 112:7-16.
[37] Lominy Decl. ¶ 19 & 23; Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 171:16-22.
[38] Lominy Decl. ¶ 14; See Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 116- 117.
[39] Lominy Decl. ¶ 21.
[40] Lominy Decl. ¶¶  20 & 22.
[41] Lominy Decl. ¶ 22.
[42] Id.
[43] Lominy Decl. ¶ 21.
[44] Id.
[45] Lominy Decl. ¶ 22.
[46] Lominy Decl. ¶ 23.

6642649

providing a tour of the office to BCHP representatives.[47]  He knew that he no longer had access to Dr. Lominy's billing information and he could no longer process payroll.[48]  All of a sudden, Mr. Marcus began keeping time records – something he had never done before.[49]  The gravy train was coming to an end and he was not happy.  Dr. Lominy made the mistake again of trusting him, thinking that he simply needed a computer to do his own work for his other businesses.[50]  She also was not comfortable confronting him, particularly since their personal relationship was estranged and they no longer lived together and she did not want to have that confrontation in front of employees.[51]  She thought, mistakenly, he would eventually stop coming to the office, and he did, almost four months later.[52]  Mr. Marcus was not performing any work for PAM after July 1, 2016 because all of PAM's management was done by BCHP, assisted by Mayra Lopez.[53]  PAM had no income, no employees and simply, for all intents and purposes, did not exist after July 1, 2016.[54]

Mr. Marcus initially commenced a proceeding with the New York State Department of Labor, but withdrew that proceeding, apparently deciding to commence this proceeding.[55]

Dr. Lominy has worked hard her entire life to become a successful pediatrician.[56]  All of her time, energy and effort were put into educating herself and then treating her patients, both in private practice and at Lincoln Hospital.  Mr. Marcus should not be allowed to trample upon those efforts with this lawsuit built upon a fiction.

## STANDARD OF LAW

Summary judgment should be granted when the moving party has set forth evidence that there is no genuine issue of material fact and the movant is entitled to judgment as a matter

---

[47] Lominy Decl. ¶ 20; Lominy Decl., Ex. "6."
[48] See Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 172:5-14.
[49] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 171:16-22.
[50] Lominy Decl. ¶ 23.
[51] Id.
[52] Id.
[53] Id.
[54] Lominy Decl. ¶ 21.
[55] Marcus Decl. ¶ 17.
[56] Lominy Decl. ¶ 25.

6642649

of law.  Fed. R. Civ. P. 56(a).  At this stage, the evidence must be construed in the light most favorable to the non-moving party and all reasonable inferences drawn in its favor. Fed. R. Civ. P. 56(c).  Summary judgment should be granted "against any party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986).  Where a plaintiff cannot establish an essential element of his claim, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23.  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts … the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87(1986) (citations omitted).  Here, the Parties each argue that summary judgment is appropriate in their favor.  Mr. Marcus, however, cannot establish essential elements of his claim and fails to point to evidence establishing a genuine issue of material fact on any of his causes of action. Accordingly, Defendants are entitled to judgment as a matter of law on all causes of action.

## ARGUMENT

### POINT I
### PLAINTIFF FAILS TO ESTABLISH ESSENTIAL ELEMENTS OF A BREACH OF CONTRACT CAUSE OF ACTION

Under New York law, to establish a breach of contract claim, a plaintiff must show (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant; and (4) damages. *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 513 (S.D.N.Y. 2012), aff'd, 766 F.3d 163 (2d Cir. 2014). It is undisputed that there is no written contract between the parties.  In support of his breach of contract claim, Plaintiff relies solely on an alleged oral promise. Specifically, Plaintiff alleges that he and Dr. Lominy entered into a "business arrangement" in which he invested a certain amount of money into the medical

practice in exchange for employment as a medical practice general manager, at an hourly rate, and _splitting 50% of the medical profits of the business_.[57] Defendants deny the existence of this alleged agreement.[58]   Notwithstanding this factual dispute, Plaintiff's purported agreement is unenforceable because it violates the New York State Education Law, the statute of frauds, and is too vague for the Court to enforce as an oral agreement.

## A.  The Alleged Oral Agreement is an Illegal Contract that Cannot be Enforced

Mr. Marcus asks the Court to enforce a purported unlawful 50/50 fee-splitting agreement between a medical professional and a non-physician.  While the issue is not often litigated, it is without doubt that courts will not enforce such an agreement. As recently stated by the New York Appellate Division, Second Department:

> It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him or her carry out his or her illegal object, nor can such a person plead or prove in any court a case in which he or she, as a basis for his or her claim, must show forth his or her illegal purpose. Where the parties' arrangement is illegal the law will not extend its aid to either of the parties or listen to their complaints against each other, but will leave them where their own acts have placed them.

_Linchitz Practice Mgmt., Inc. v. Daat med. Mgmt., LLC_, 165 A.D.3d 908, 909 (2d Dep't 2018) citing _Stone v. Freeman_, 298 N.Y. 268, 271 (1948). _See also, LoMagno v. Koh_, 246 A.D.2d 579, 579 (2d Dep't 1998) (Court refused to enforce alleged oral agreement constituting a voluntary, prospective arrangement for the splitting of fees with a medical provider).  As set forth below, the purported business arrangement for which Plaintiff seeks enforcement is unlawful.

Article 130 of the N.Y. Education Law contains the general provisions governing medical professionals.  Article 30, Sub article 3, Section 6509 ("§ 6509") contains the general definition of professional misconduct under Article 130.   It provides in relevant part that the following conduct, _inter alia_, constitutes professional misconduct: "9. Committing unprofessional conduct, as defined by the board of regents in its rules or by the commissioner in regulations approved by the board of regents." A violation of § 6509 subjects licensees to penalties contained in

---

[57] Compl. ¶ 30; Declaration of Jay Marcus dated May 19, 2020 ("Marcus Decl.") ¶ 9.
[58] Lominy Decl. ¶ 8 & 10.

sections § 6511, which include but are not limited to license revocation.  Article 131-A contains

the professional conduct guidelines for physicians, including pediatricians such as Dr. Lominy.

Specifically, New York Education Law § 6530 defines professional misconduct for physicians.

Pursuant to Paragraph 19 of this Section, the following constitutes professional misconduct:

> 19. Permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law; …

The violation of N.Y. Educ. Law § 6530 results in the penalties under Section 230(a) of the N.Y.

Public Health Law, which include but are not limited to license revocation.

The alleged oral agreement at issue in this action falls squarely within the professional

misconduct statutes.  It is undisputed that PAM operated as a pediatric medical practice.[59] It is

undisputed that Dr. Lominy was the sole owner and sole shareholder of the practice.[60] It is

undisputed that Dr. Lominy's medical services provided to patients were PAM's sole source of

revenue.[61] Mr. Marcus does not claim to be a physician or a licensed medical professional in

any capacity.[62] Thus, Mr. Marcus is a layperson, non-physician seeking to claim a share of

profits with a physician.  Accordingly, the purported oral agreement for 50% of PAM's profits in

exchange for investment funds constitutes professional misconduct under N.Y. Educ. Law §

6509 and illegal fee-splitting under N.Y. Educ. § 6530[19].

Courts have consistently and soundly refused to enforce unlawful fee splitting

arrangements. *Linchitz Practice Mgmt., Inc, supra,* (affirming denial of summary judgment  to

---

[59] Marcus Decl., Ex. "6"; Gilbride Decl., Ex. "B."
[60] Marcus Decl., Ex. "6," document bearing bates JMARCUS_00330; Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 57:10-16.
[61] Compl. ¶¶ 9 & 10.
[62] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 35:15-36:15.

Plaintiff and granted summary judgment to Defendant in connection with a promissory note because the note and related agreement were a pretext for unlawful fee-splitting between a physician and non-physician in violation of N.Y. Education Law § 6509-a and 6530(19); *S. Shore Neurologic Assocs., P.C. v. Mobile Health Mgmt. Servs.*, Inc., 121 A.D.3d 881, 881 (2d Dep't 2014) (New York State courts have refused to enforce agreements formed as a pretext to justify unlawful fee-splitting agreements)*; Sheldon Rabin, M.D., P.C. v. Hirschfield*, 223 A.D.2d 535, 536 (1996) and *Baliotti v. Walkes*, 115 A.D.2d 581, 581 (2d Dep't 1985) (refusing to enforce an alleged management agreement which violates State law prohibiting fee-splitting arrangements).[63] *See also*, *United Calendar Mfg. Corp. v. Huang*, 94 A.D.2d 176, 177 (2d Dep't 1983) (Plaintiff sought an injunction and money damages based upon a fee splitting arrangement prohibited by Educ L. § 6509-a, the court would not aid the plaintiff in its illegal purpose); *Hartman v. Bell*, 137 A.D.2d 585, 586 (2d Dep't 1988) (agreement between physicians for sale of practice constituted a voluntary prospective arrangement for the splitting of fees in contravention of Education Law § 6509–a and State public policy). This Court should also decline to dismiss the purported 50/50 profit sharing arrangement as, even if true, it is an unlawful fee-splitting arrangement.

Plaintiff claims that his purported agreement with Dr. Lominy does not violate New York Law on the basis that Education Law § 6530 permits physicians to share fees with "employees." This argument is without merit.  First, N.Y. Educ. Law § 6530 allows a licensed professional to use the revenue generated from the medical practice to pay the partners, employees or associates of the practice.  It does, however, not allow such a professional to share the practice's profits 50/50 with a non-physician employee.  Plaintiff's overbroad reading of the statute would wholly undermine the statute's purpose--permitting a physician to share profits

---

[63] Several cases cited herein refer to violations of N.Y. Educ. Law § 6509-a, which defines professional misconduct for health providers who are not physicians, including*, e.g.*, dentists, chiropractors, nurses, and optometrists. Like § 6509, § 6509-a defines "fee splitting" as professional misconduct subject to strict penalties.  The courts reasoning with regard to § 6509-a applies in addressing the same issue of illegal fee-splitting under § 6509.

6642649

with any person so long as they are employed by the entity. Certainly, this was not the legislative intent. Second, Plaintiff's testimony demonstrates that he was not seeking a 50/50 share of PAM's profits for employment services rendered; rather, he claims that he is entitled to 50% of the practice's profits in exchange for his alleged initial capital investment.[64]

Notably, under New York law, medical service corporations must be owned and controlled exclusively by licensed medical professionals who practice medicine through the corporation. *Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 256 (E.D.N.Y. 2012); *see* N.Y. Bus. Corp. Law § 1507.  While Plaintiff is careful to claim that Dr. Lominy was the sole owner of PAM, it is clear that he considered himself a part owner of the business. Marcus filed the medical practice's Articles of Organization with the Department of State,[65] and alleges that he supplied the initial investment funds to open the business, maintained all the accounts for the medical practice, was responsible for managing the office, hiring staff, administering payroll, organizing supplies, patient billing, and accounts receivable.[66]  In addition, Marcus was the sole and principal conduit for the accountant for the business, supplying all of the information upon which the accountant prepared PAM's annual tax statements.[67] Moreover, Marcus admits involvement in calculating and distributing the profits from the business and making decisions about how much salary both he and Dr. Lominy should be paid.[68]

Plaintiff also attempts to sidestep the unenforceability of his illegal fee-splitting arrangement by claiming that he operated as a "Management Service Organization"("MSO"). To avoid liability for fee-splitting under New York Law, the relationship between a management service organization ("MSO") and a medical practice must be carefully structured to avoid exercising too much control over the medical practice itself, and especially over the medical

---

[64] *See* Pl. Memo of Law p. 1, 3, 11.
[65] Marcus Decl., Ex. "6," document bearing bates JMARCUS_00329.
[66] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 82:14-19; Lominy Decl. ¶ 11; Marcus Decl., Ex. "8."
[67] Lominy Decl. ¶ 18; Lominy Decl., Ex. "8," Kanner Dep. Tr. at p. 17.
[68] Gilbride Decl. Ex. "A," Marcus Dep. Tr. at  p. 112- 118, 174-175

professional's medical decision making.[69]   Plaintiff fails to cite to any admissible evidence supporting that he was the MSO for the practice and there was no structure, let alone careful structure, to demonstrate an MSO arrangement. First, there is no written agreement. Second, Plaintiff admits that he carried out the revenue sharing portion of the alleged agreement in a haphazard manner[70] – the opposite of a carefully structured agreement. Furthermore, an MSO based simply on a percentage of the medical practice's gross or net income "can violate the fee-splitting prohibition, can void the MSO agreement, and can constitute professional misconduct."[71]

Courts have held that agreements with far more structure, fall short of creating an MSO relationship and constitute unlawful fee-splitting arrangements.   *See e.g.*, *S. Shore Neurologic Assocs., P.C. v. Mobile Health Mgmt. Servs., Inc.*, 37 Misc. 3d 1226(A), 964 N.Y.S.2d 63 (Sup. Ct. 2012), aff'd sub nom. *S. Shore Neurologic Assocs., P. C. v. Mobile Health Mgmt. Servs., Inc.*, 121 A.D.3d 881, 995 N.Y.S.2d 93 (2014) (The court found that agreement was a pretext for an unlawful fee splitting scheme). *See also, Preferred Oncology Networks of Am., Inc. v. Bottino*, No. 96 CV 1898 (BDP), 1997 WL 305253, at *1-2 (S.D.N.Y. May 28, 1997). Accordingly, Plaintiff's claim that he was an MSO must fail.

## B.  The Alleged Oral Agreement is Unenforceable

Even if the Court finds that the alleged oral agreement is not an illegal fee-splitting agreement, Plaintiff's claims of breach of contract fail because the contract is not enforceable under general principles of contract law. *Kolchins v. Evolution Markets, Inc.*, 128 A.D.3d 47, 59 (1st Dep't 2015); 22 N.Y. Jur. 2d, Contracts, § 9.   The meeting of the minds must include agreement on all essential terms. *Id.*  (citing *Kowalchuk v. Stroup,* 61 A.D.3d 118, 121 (1st Dep't 2009)).   There is a heavier burden placed on a plaintiff seeking enforcement of an alleged oral

---

[69]  *See* Exhibit A, Francis J. Serbaroli, *Ownership of Medical Practices in New York and the Role of Private Investors*, New York Law Journal (July 24, 2018, 11:14 AM), https://www.law.com/newyorklawjournal/2018/07/24/ownership-of-medical-practices-in-new-york-and-the-role-of-private-investors/.

[70] Pl. Memo of Law, p. 4.

[71] Serbaroli, *supra*.

agreement.   In order "[t]o ensure that parties are not trapped into surprise contractual obligations that they never intended, more than agreement on each detail is required, there must be an overall agreement to enter into the binding contract." *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 513 (S.D.N.Y. 2012), (citing *Bloch v. Gerdis*, No. 10 Civ. 5144 (PKC)(AJP), 2011 WL 6003928, at *3 (S.D.N.Y. Nov. 30, 2011)) (quotations omitted); *Express Ind. and Terminal Corp. v. New York State Dept of Transp.*, 93 N.Y.2d 584, 589 (N.Y. 1999) (citing *Martin, Delicatessen, Inc. v. Schumacher,* 52 N.Y.2d 105, 109 (N.Y. 1981); *Durso v. Baisch*, 37 A.D.3d 646, 647 (2d Dep't. 2007) (citing *Merschrod v. Cornell Univ.,* 139 A.D.2d 802, 805 (2d Dep't 1988)).  Here, there is simply no evidence of a meeting of the minds with regard to the terms of any contract, much less an employment contract for life.

In determining the existence of a valid contract, the Court will begin its analysis with the communications between the parties. Here, Plaintiff alleges that in exchange for his alleged initial investment, Dr. Lominy agreed to employ him as the Office Manger and share profits with him indefinitely.[72]   Mr. Marcus alleges that Dr. Lominy agreed to employ him as the office manager for the rest of his or her career,[73] or "the length of Mr. Marcus' career until he decided to retire or could no longer work, or until the practice failed, closed or was sold."[74]  This offer is akin to an alleged offer of permanent employment. Strikingly for such an onerous, lengthy arrangement, there are no communications between the parties evidencing any such agreement. Plaintiff provides self-serving testimony, and Defendants dispute the communication. There are no e-mails, text messages, offer letters, or even handwritten notes on a bar napkin.  As the New York Court of Appeals commented nearly a century ago, "an agreement to employ the plaintiff in such a position for life is so unusual that we would expect to find it contained in some writing." *See Arentz v. Morse Dry Dock & Repair Co.*, 249 N.Y. 439, 441 (1928).  In contrast, when Plaintiff and Dr. Lominy decided to purchase a commercial

---

[72] Marcus Decl. ¶ 9.
[73] Pl. Memo of Law p. 11; Marcus Decl. ¶ 9.
[74] Compl. ¶ 30.

property together at 88 West Lincoln Avenue, they entered into a formal agreement spelling out in detail the terms of that arrangement.[75]

As discussed in *Arentz* and subsequent cases, New York law does not recognize offers of "permanent employment" as an enforceable duration term in a contract. *Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 138 (2d Cir. 2007), certified question accepted, 9 N.Y.3d 1020 (2008), and certified question answered, 11 N.Y.3d 80 (2008). Plaintiff's reliance on *Rooney v. Tyson*, 91 N.Y.2d 685, 688 (1998) is entirely misplaced. First, the *Tyson* Court noted that it was ruling upon a "precise" issue referred to it by the Second Circuit. The "precise" issue was whether an undisputed (it was memorialized on a videotape at a press conference) promise to employ someone for "as long as the boxer fights professionally," provides a definite legally cognizable duration. The Court of Appeals held that, under those circumstances, the contractual term of duration was established. The Court absolutely did not hold, as plaintiff argues, that Tyson's oral statement amounted to an enforceable employment contract. It held that the durational element of an employment contract need not be tied to a calendar date to be enforceable. *Id.* at 692.

Here, there is no videotape of Dr. Lominy making a statement at a press conference – there is no evidence whatsoever of not only a durational element, but all of the other elements required to enforce any oral contract, much less an employment contract. If a court cannot determine what in fact the parties have agreed to, and the agreement is not reasonably certain in its material terms, there can be no legally enforceable contract. *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 609 (S.D.N.Y. 2010) (quoting *166 Mamaroneck Ave. Corp v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991)). In this case, the Court has nothing to rely upon other than plaintiff's self-serving statements and self-serving siphoning of profits for which he paid no income tax.

---

[75] Lominy Decl., Ex. "9," 88 West Lincoln LLC Operating Agreement.

### C.  The Purported Oral Contract is Barred by the Statute of Frauds

Plaintiff's purported contract is also barred by the Statute of Frauds. New York's General Obligations Law § 5-701 requires that "[e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking … [b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime." N.Y. Gen. Oblig. Law § 5-701(a)(1).

### i.      The Purported Agreement Could Not be Performed Within One Year

*Both* parties must be capable of performance within one year for a contract to fall within the performance exception to the Statute of Frauds. When the option to terminate rests with the plaintiff alone, and only one party is capable of performance, the Statute of Frauds bars enforcement of the oral contract. *See S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 106 (2d Cir. 2009); *McCoy v. Edison Price*, Inc., 186 A.D.2d 442, 443 (1st Dep't 1992) (Where the alleged oral agreement only may be terminated within one year upon a breach thereof or non-performance, it is not exempt from the Statute of Frauds.").

Here, Plaintiff alleges that Dr. Lominy agreed to: (1) employ him as a practice manager until he decided to retire or could no longer work, or until the practice failed, closed or was sold; (2) to pay him an hourly rate of pay; and (3) to split 50% of PAM's profits with him.[76]  The only party capable of performing or terminating the purported agreement is Plaintiff himself.  The only person who could decide if Plaintiff retired or could no longer work is Plaintiff. Under the terms of the alleged agreement, Dr. Lominy had no option to terminate Plaintiff or end the agreement if she no longer wanted to continue employing him, the only way she could stop employing him, paying him an hourly rate, or splitting profits with him would be if the practice failed, closed or was sold. As the *McCoy* court held, such an agreement is incapable of performance within one year and is voidable by the Statute of Frauds.

---

[76] Compl. ¶ 30-31.

6642649

Plaintiff will likely try to argue that according to the terms of the alleged agreement, Dr. Lominy could decide to close or sell the practice, but as set forth in the above case law, this would render the contract incapable of performance at all. The only party capable of performance in this alleged and fictitious contract is Marcus himself. *Zaitsev v. Salomon Bros.*, 60 F.3d 1001, 1003 (2d Cir. 1995) (citing *Sawyer v. Sickinger*, 47 A.D.2d 291, 294 (1st Dep't 1975).

## POINT II
## PLAINTIFF IS NOT ENTITLED TO EQUITABLE RELIEF

Plaintiff seeks enforcement of a disputed, unlawful fee-splitting agreement.  For the reasons that courts decline enforcement of illegal contractual obligations, equitable relief should also be denied to Mr. Marcus. *See e.g. Sachs v. Saloshin*, 138 A.D.2d 586, 587 (2d Dep't 1988) (dismissing dentist's claims for restitution predicated upon theory of unjust enrichment against landlords, finding that as a voluntary participant in the unethical arrangement for the prospective splitting of fees, he was not entitled to recover under a theory of unjust enrichment).  Further, Plaintiff's hands are unclean and he is not entitled to equitable relief. Finally, he fails to state essential elements of any equitable causes of action.

### A. Plaintiff's Claims for Equitable Relief Are Barred By the Doctrine of Unclean Hands

It is a fundamental principle that "he who comes into equity must come with clean hands."  *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *Laugh Factory Inc. v. Basciano*, 608 F.Supp.2d 549, 560 (S.D.N.Y.2009);  *Lia v. Saporito*, 909 F. Supp. 2d 149, 174 (E.D.N.Y. 2012), aff'd, 541 F. App'x 71 (2d Cir. 2013).  Plaintiff has engaged in unconscionable conduct.  Dr. Lominy trusted and relied upon Mr. Marcus as her employee and her romantic partner.[77]  He has proved himself unworthy of this trust by siphoning PAM's profits, changing his salary when he felt the need and failing to report taxable income.[78]

---

[77] Lominy Decl. ¶¶ 5 & 12.
[78] Lominy Decl. ¶¶ 18-19.

6642649

Further, Mr. Marcus falsely claims that he used his funds for PAM's business, but the alleged funds were used to purchase a home.[79]

Moreover, Mr. Marcus was responsible for processing PAM's payroll, maintaining his own payroll records, and now he comes before the Court to say that he failed to do his job for PAM entitling himself to overtime. Mr. Marcus' conduct is certainly unconscionable and his claims for equitable relief should be denied. *See Goldstein v. Delgratia Min. Co.*, 176 F.R.D. 454, 458 (S.D.N.Y. 1997).

**B. There are No Disputes of Material Fact in Connection with Plaintiff's Quantum Meruit and Unjust Enrichment Causes of Action**

Under New York law, claims of unjust enrichment and quantum meruit are analyzed together as a single quasi-contract claim. *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 613 (S.D.N.Y. 2010). New York law is equally clear that quasi-contract claims are barred by the statute of frauds. *Id.*; N.Y. Gen. Oblig. Law § 5-701(a)(10) (a contract implied in fact or in law to pay reasonable compensation must be in writing).

A quantum meruit claim is not a device with which a plaintiff may enforce a purported agreement which might ultimately be found not to be viable. *Kreiss v. McCown DeLeeuw & Co.*, 37 F. Supp. 2d 294, 302 (S.D.N.Y. 1999); *Martin H. Bauman Assocs., Inc. v. H & M Int'l Transp., Inc.*, 171 A.D.2d 479, 484 (1st Dep't 1991).

Like claims for quantum meruit, unjust enrichment is not available as a catchall cause of action to be used when others fail, or where it simply duplicates, or replaces, a conventional contract or tort claim.  To prevail on an unjust enrichment, a plaintiff must show (1) that a benefit was conferred upon defendant, and (2) that as between the two parties enrichment of defendant is unjust. *Nelson v. Stanley Blacker, Inc.*, 713 F. Supp. 107, 111 (S.D.N.Y. 1989).

Plaintiff fails to raise a triable issue of fact on any of his quasi-contract claims.  First, there was no benefit conferred upon Dr. Lominy. Marcus alleges that the benefit he conferred was the alleged "investment" of $341,338.87 that he gave to Dr. Lominy to start PAM. However,

---

[79] Lominy Decl. ¶ 13; Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 147:13-149:2.

Plaintiff has not produced a single shred of evidence that he ever transferred any money – let alone this amount – to Dr. Lominy.  All of the evidence of monetary transfers produced in this case have shown transferred funds exclusively in Dr. Lominy's name. Moreover, it is undisputed that almost $300,000 of PAM's funds were used as a down payment on the Fox Run house, a house on which Dr. Lominy paid the mortgage and all other expenses while she lived there.[80] Dr. Lominy worked the equivalent of two full time jobs, working at PAM during the day, and working shifts at the hospital in the evenings and on weekends to pay for the use of the office and equipment that formed the basis of PAM when it was founded.[81] Dr. Lominy was never unjustly enriched by Plaintiff's fictitious investment.

Mr. Marcus admits receiving 50% of PAM's profits, which he testified were $40, $50 or $60,000 a year over the course of almost nine years, in addition to wages, which he alone reported to the payroll processor for PAM.[82]  In Dr. Lominy's experience, this more than adequately compensated Mr. Marcus.[83]

### C.  Plaintiff's Causes of Action for Unjust Enrichment is Duplicative of his Breach of Contract Cause of Action

Plaintiff's claims for unjust enrichment are duplicative of his breach of contract claims. In *Solomatina v. Mikelic*, 370 F. Supp. 3d 420, 423 (S.D.N.Y. 2019). Plaintiff sets forth no alternative facts for his unjust enrichment claims.  *See also Rogowsky v. McGarry*, 55 A.D.3d 815, 817 (2d Dep't 2008) (since the plaintiffs failed to allege that the defendant violated a legal duty independent of the purported oral agreement, they are unable to assert a viable cause of action for unjust enrichment.

### D.  Plaintiff Cannot Recover Under a Promissory Estoppel Theory

Promissory estoppel requires Plaintiff to prove three elements: (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance on that promise; and (3) injury

---

[80] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 147:13-149:2; Lominy Decl. ¶ 12.
[81] Lominy Decl. ¶ 7.
[82] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 112, 123-124.
[83] Lominy Decl. ¶ 19.

to the relying party as a result of the reliance. *Genger v. Genger*, 76 F. Supp. 3d 488, 502 (S.D.N.Y. 2015), aff'd, 663 F. App'x 44 (2d Cir. 2016).   Plaintiff's promissory estoppel claim arises out of the same alleged breach of the alleged oral agreement, which amounts to an illegal fee-splitting scheme.   Even if the Court finds that the purported oral agreement is not a pretext for future unlawful fee-splitting, the existence of the promise is clearly in dispute and Plaintiff is not entitled to summary judgment.

**POINT III**
**PLAINTIFF'S WAGE AND HOUR CLAIMS ARE MERITLESS**

Plaintiff's wage and hour claims are particularly fraught with contradictions. Those claims should be considered in the context of the payroll practices at PAM.  Mr. Marcus admits that he was responsible for processing payroll.[84] He admits that he increased his own salary from $15.00 to $75.00 hour in December 2015.[85] He signed off on employee payroll.[86]   In this regard, Mr. Marcus is responsible for his own alleged unpaid wages. He claims that he is a founder, investor, would-be shareholder, but for his wage claims seeks to paint himself as an hourly employee with unpaid overtime violations. Plaintiff fails to raise a triable issue of material fact in connection with those claims.

**A.  Plaintiff Fails to Show FLSA Coverage**

There is no genuine factual dispute with respect to whether Mr. Marcus was a covered employee for purposes of his FLSA claim which is a necessary element. *Jian Long Li v. Li Qin Zhao*, 35 F.Supp.3d 300 (E.D.N.Y 2014) citing *Owusu v. Corona Tire Shop, Inc.*, No. 09–CV–3744, 2013 WL 1680861, at *3 (E.D.N.Y. Apr. 17, 2013)  A plaintiff is covered by the FLSA, where he is (i) "engaged in commerce or in the production of goods for commerce" ("individual coverage"), or (ii) "employed in an enterprise engaged in commerce or in the production of goods for commerce" ("enterprise coverage"). 29 U.S.C. §§ 206(a), 207(a)(1); *Jian Long* at 305. (internal citations omitted) .

---

[84] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 112.
[85] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 112, 172-175; Lominy Decl. ¶¶ 19.
[86] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 112; Lominy Decl. ¶ 11.

1.      **There is no Enterprise Coverage under the FLSA**

Plaintiff must establish that his employer is an "enterprise" whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A);16 see also A*rchie v. Grand Cent. P'ship, Inc.*, 997 F.Supp. 504, 528 (S.D.N.Y.1998) (Sotomayor, J.) (explaining the "requirement that the enterprise be 'engaged in commerce or in the production of goods for commerce' "). Here, Plaintiff fails to show that Defendants' annual sales volume was more than $500,000 every year. PAM's tax returns confirm that there is no enterprise coverage.[87] See *Jian Long Li, supra* (Defendant's tax return to confirm sales volume is below $500,000 for purposes of enterprise coverage under the FLSA).

2.      **There is No Individual Coverage under the FLSA**

For purposes of individual coverage, the plaintiff is an employee (i) "engaged in the production of goods for commerce," when he "handl[es] or otherwise work[s] on goods intended for shipment out of the State, directly or indirectly"; or (ii) otherwise "engaged in commerce," when he "perform[s] work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof." *Jian Long Li*, at 307 (citing 29 C.F.R. §§ 779.103, 779.104). Activities that simply "affect or indirectly relate to interstate commerce" are insufficient. *McLeod v. Threlkeld*, 319 U.S. 491, 497, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943) (Reed, J.). As a basic rule, "if [the plaintiff] did not have any contact with out-of-state customers or businesses, he cannot be individually covered under the FLSA." *Yang Li v. Ya Yi Cheng*, No. 10-CV-4664, 2012 WL 1004852, at *4 (E.D.N.Y. Mar. 23, 2012).

Marcus does not allege, nor does the evidence show, that he was an employee "engaged in the production of goods for commerce."[88] Bare assertions of credit card use and use of the internet are insufficient to demonstrate interstate commerce for individual coverage

---

[87] Lominy Decl., Ex. "1," PAM's tax returns.
[88] See, Pl. Memo of Law p. 22.

under the FLSA.  PAM's practice was local to Westchester, mainly Mount Vernon and PAM's patients were local New York residents.[89]

The United States Court of Appeals for the Eleventh Circuit held in *Thorne v. All Restoration Services, Inc.*, 448 F.3d 1264, 1267 (11th Cir. 2006) that, "assuming, without deciding, that credit card transactions alone could constitute an instrumentality of interstate commerce, [plaintiff] Thorne did not produce sufficient evidence of interstate activity to overcome" Defendants' motion under Fed. Rule Civ. Pro. 50. The plaintiff in Thorne "did not produce evidence that he corresponded with merchants outside the state of Florida using the mail, phone, or fax, and nor did he produce evidence that he made purchases of goods from out-of-state vendors." *Id* Accordingly, the 11th Circuit held that Plaintiff failed to meet his burden to show FLSA coverage.

Plaintiff's reliance on *Silk v. Albino*, No. 8:06CV33 T23TBM, 2007 WL 853752 (M.D. Fla. Mar. 19, 2007), to support his assertion that "regular use of the mail, telephone, and processing credit cards was sufficient to be covered under the FLSA" is unpersuasive.[90] The *Silk* court made no finding as to whether, as Plaintiff claims, "regular use of the mail, telephone, and processing credit cards was sufficient to be covered under the FLSA." In contrast, another Florida court in *Dent v. Giaimo*, 606 F. Supp. 2d 1357, 1361 (S.D. Fla. 2009) granted summary judgment for the defendant, finding that plaintiff, a medical assistant whose duties included checking patients in and out of their appointments, verifying insurance coverage, answering the phone, filing, faxing and other clerical duties, did not sufficiently establish that she engaged in interstate commerce when she alleged that she regularly used the telephone, internet, and facsimile machine to contact out of state insurance companies and process patients' credit card payments because she did not allege how much of her time was spent on such activities.

As noted by the *Jian Long Li* Court, to conclude otherwise would lead to untenable results: "any employee who regularly uses a car or cellular phone for work, whether or not he

---

[89] Lominy Decl. ¶ 11.
[90] Pl. Memo of Law p. 22.

engages with "out-of-state customers or businesses," would be covered under the FLSA. *Jian Long Li v. Li Qin Zhao,* 35 F. Supp. 3d 300, 309 (E.D.N.Y. 2014). The *Jian Long Li* Court further commented that "it is difficult to imagine anyone, in this modern day and age, who does not meet this definition." *Id.* Accordingly, Defendants are entitled to summary judgment on Plaintiff's FLSA claim.

### B. Plaintiff is Exempt from FLSA Overtime

Even if Plaintiff demonstrates FLSA Coverage, he is exempt for the FLSA's overtime requirements pursuant to the Executive, Administrative or Combined exemption. Courts have found summary judgment to be an appropriate tool for deciding classification issues under the FLSA and NYLL. *See, e.g., Krumholz v. Village of Northport*, 873 F. Supp. 2d 481, 492–93 (E.D.N.Y. 2012) ("[I]t is a strict question of law whether the activities and responsibilities of the employee, once established, exempt him or her from the FLSA's overtime requirements"). Here, the activities associated with Mr. Marcus' employment that are not in dispute demonstrate that he was an exempt employee.

Plaintiff was employed in a *bona fide* administrative or executive capacity, and as such is exempt from the FLSA's minimum wage and overtime provisions. Marcus paid himself consistently the same amount of money, each week, regardless of the number of hours he worked, or the type of work he performed.[91] He siphoned off money from the practice for "bonuses" as part of his self-arranged compensation plan,[92] and he had discretion and autonomy in managing PAM's finances, paying bills, and paying all other employees.[93]

### 1. Plaintiff is an Exempt Administrative Employee Under the FLSA and NYLL

The definition of an administrative employee includes any employee: (1) compensated on a salary or fee basis at a rate not less than $455[94] per week; (2) whose primary duty is the

---

[91] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 112, 172-173; Marcus Decl. ¶ 13.
[92] *See* Compl. ¶ 30; Lominy Decl. ¶ 14.
[93] Lominy Decl. ¶ 11.
[94] Under the FLSA, at the time of Mr. Marcus' employment with PAM  the salary threshold from the Administrative and Executive exemptions  was $455/week ($23,660 annually).

performance of office or non-manual work directly relate to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. "The distinction between administrative work and production work separates 'those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services that the enterprise exists to produce and market.'" *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 705 (S.D.N.Y. 2005) (citations omitted).

i. It is Undisputed that Plaintiff Received Sufficient Compensation to Qualify as Administratively Exempt under the FLSA and NYLL.

An employee is considered to be paid on a "salary basis" if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602. Although Plaintiff attempts to allege that he was paid on an hourly basis, the record indisputably shows that he was paid on a salary basis. Plaintiff paid himself $600 biweekly every week for 2014 through January 2016, a predetermined amount, which was not reduced based on any variations in the quality or quantity he worked, the hours he actually worked, or the amount of time-off he took.[95] In addition to the weekly wages that Plaintiff paid himself, Plaintiff also compensated himself with the "bonuses" he received as part of the purported profit-splitting arrangement he allegedly had with Dr. Lominy.[96] This Court has calculated an employee's weekly salary by including the employee's bonus pay in the calculation. *See Seltzer v. Dresdner Kleinwort Wasserstein, Inc.*, 356 F. Supp. 2d 288, 301 (S.D.N.Y. 2005) (finding that plaintiff's base salary combined with her annual bonus put her well over the weekly salary threshold for administrative exemption). Here,

[95] Marcus Decl. ¶ 13; Marcus Decl., Ex. "9," Marcus' payroll records.
[96] Marcus Decl., Ex. "14," Marcus and Dr. Lominy's revenue share (this document was never produced during discovery); Gilbride Decl., Ex. "E."

6642649

Plaintiff's weekly pay combined with his self-awarded bonuses bring him within the minimum base pay to bring him within the FLSA exemptions.

ii.   <u>Plaintiff's Work was Directly Related to the Management and General Business Operations of PAM.</u>

Plaintiff's day-to-day activities were directly related to the management and business operations of PAM. Throughout his employment, Plaintiff's primary duty was directly related to managing the medical practice, including paying employees, paying the bills, managing the computer software of the practice, and handling the cash flow and finances.  These job duties are indispensable to the Defendants' business operations.

In *Schwind v. EW & Assocs., Inc.*, this Court found that plaintiff was exempt under the administrative exemption of the FLSA. 357 F. Supp. 2d 691, 706 (S.D.N.Y. 2005) Although plaintiff argued that his role primarily involved sales, the Court found that his duties involved the "very business of EWA."  *Id.* at 705. In addition, plaintiff was not subject to supervision by the defendants, was not required to keep time sheets, planned his own schedule, made many decisions that were vital to the management and business of EWA, and often represented himself as a partner of EWA. *Id.*

Marcus' work was similarly directly related to the "very business" of PAM, however, his role was even more related to the management or general business operations than the plaintiff in *Schwind*.   All duties, other than providing medical care, including hiring employees, ordering supplies, managing payroll, paying maintenance bills, rent, and managing the finances of the business were Marcus' responsibility, to which Dr. Lominy full entrusted him to handle.[97]

iii.   <u>Plaintiff Exercised Discretion and Independent Judgment.</u>

Plaintiff exercised discretion and independent judgment during his employment with PAM.   Plaintiff's position demanded decision-making ability exercised on a day-to-day basis without supervision immediately available. All of these duties require the exercise of discretion and independent judgment within the meaning of 29 C.F.R. § 541.201.

---

[97] Lominy Decl. ¶¶ 10 & 11.

iv.   <u>Plaintiff Had Independent Discretion and Judgment on Significant Matters</u>

Plaintiff's judgment impacted matters of significance for PAM. He was the sole conduit with Bruce Kanner, PAM's accountant.[98] He made decisions concerning what type of corporate form PAM should take.[99] He described himself as PAM's administrator on the Annual Wage Notices which he prepared and provided to employees.[100] A review of Plaintiff's purported job description, which he prepared (Plaintiff's Exhibit 8 to Marcus Decl.) includes 1) Strategic Planning and Implementation; 2) Cost Reduction, Crisis Management; 3) Manage Account payable; 4) Process all financial report; 5) Budget Administration/Management Internal Systems and Controls; and 6)Team Building and Leadership. Plaintiff's work easily satisfies each prong of the Administrative Exemption, and therefore, Defendants are entitled to summary judgment.

## 2. Plaintiff is Exempt under the Executive Exemption

The Department of Labor regulations defining the terms of the FLSA's executive exemption provide that "[t]he term 'employee employed in a bona fide executive capacity' ... shall mean any employee":

(1) Compensated on a salary basis at a rate of not less than $455 per week ..., exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

---

[98] Lominy Decl., Ex. "8," Kanner Dep. Tr. at p. 17.
[99] *See* Exhibit "K-2" to Kanner Declaration.
[100] Lominy Decl., Ex. "2," documents bearing bates MML000917 through MML000922; Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 108:17-109:12.

6642649

As set forth above, Plaintiff meets the salary basis criteria.  Plaintiff's responsibilities at PAM involved managing the medical practice which satisfies the second and fourth factor of the Executive Exemption. In addition, he paid all employees of the practice and determined their rate of pay, including whether they were entitled to overtime compensation (without regard to the hours they actually worked or any applicable state or federal laws).[101] Marcus also hired employees, determined whether and when they could take vacation time, and recorded their working hours.[102] Plaintiff was fully responsible for setting his own hours, determining what his own responsibilities were, and deciding when he would report to work and when he would not.[103] Plaintiff easily meets the requirements of an executive employee, and qualifies as an exempt employee under the FLSA.

### 3.  Plaintiff is Exempt Under a Combined Exception

In addition to the administrative exemption and executive exemption, federal law recognizes a combined exemption.  "An employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section." 29 C.F.R. § 541.708.   Should the Court find Plaintiff does not squarely fit the administrative or executive exemption, Plaintiff's duties still qualify as exempt in that his job duties fall within a combination of both exemptions.  See *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626 (7th Cir. 2010).

### C.   Plaintiff Fails to Raise a Triable Issue of Fact on his Wage and Hour Claims

Even assuming *arguendo*, that Plaintiff has shown that he is a covered employee under the FLSA and the NYLL, and that he is a non-exempt employee, Plaintiff fails to show that he was not compensated for any hours in a specific workweek.  An employee who brings suit for unpaid minimum wages or unpaid overtime compensation, has the burden of proving that he

---

[101] Id.; Lominy Decl. ¶ 11.
[102] Gilbride Decl., Ex. "C," Declaration of Mayra Lopez dated January 17, 2020 ("Lopez Decl.") ¶¶ 15-16; Lominy Decl. ¶¶ 10-11.
[103] Gilbride Decl., Ex. "C," Lopez Decl. ¶¶ 5-6.

6642649

performed work for which he was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946). Here, Marcus has utterly failed to come forward with any evidence that he was improperly compensated.

To maintain a claim for unpaid overtime under the FLSA and the NYLL, Mr. Marcus must prove that he worked in excess of forty hours per week at PAM. 29 U.S.C. § 207(a); NYLL § 651. As set forth above, Mr. Marcus was an exempt employee so time records were not required and he alone made that determination in any event. Further, Mr. Marcus was responsible for maintaining PAM's time and payroll information.[104] He claims that he only compensated himself for 20 hours when he actually worked 40 hours.[105] While a Plaintiff may rely on their own testimony, that testimony must be reasonable.

Plaintiff's reliance upon the Declaration of Mayra Lopez, a PAM employee, as evidence that he worked over forty hours a week, is misplaced. Ms. Lopez's Declaration shows that at no time did Marcus work in excess of 40 hours, and in fact was in the office far less than her or Dr. Lominy.[106] She states that Marcus came in later than she did, left before she did, and often left the office for several hours during the day,[107] and never worked on the weekend during years when the practice saw patients on Saturdays.[108] Ms. Lopez does not state that she observed Plaintiff working even when he was in the office, because she was busy assisting Dr. Lominy with patients. Moreover, Plaintiff managed other businesses while he was PAM's office manager, and likely used his office at PAM to run his other businesses as well. He likely worked even fewer hours than the amount he compensated himself. He was involved in the renovations at 88 West Lincoln, directing contractors and sub-contractors with respect to that

---

[104] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 112:7-16.
[105] Pl. Memo of Law p. 21.
[106] Gilbride Decl., Ex. "C," Lopez Decl. ¶¶ 5-7.
[107] Id.
[108] Id. ¶ 8.

6642649

renovation project.[109]  Even assuming that Marcus only performed work for PAM the entirety of

the time he was in the office, he was not at the office for even close to 40 hours a week.[110]

Plaintiff relies on *Kuebel v. Black & Decker Inc.*, for the premise that it was Dr. Lominy's

obligation to ensure that Plaintiff's hours were properly counted and that he was paid correctly.

However, Plaintiff's reliance on this case is misplaced. In *Kuebel*, while the court held that it is

an employer's duty under the FLSA to maintain accurate records of its employees' hours, it also

explained that this duty occurs once the "employer knows or has reason to know that an

employee is working overtime." 643 F.3d 352, 363 (2d Cir. 2011). Kuebel admitted that he

falsified his own timesheets, but explained that he did so at his employer's instruction, who

instructed him not to record more than forty hours per week, regardless of how many hours he

actually worked. *Id.* In stark contrast, Mr. Marcus' misrepresentation of his own time sheets and

hours worked were entirely at his own discretion.  Mr. Marcus testified that he kept his salary

artificially low in order to grow the practice.[111]  He may have kept his salary artificially low to

avoid paying tax, since it is undisputed that he never reported the profits he siphoned from

PAM.[112]

Not only was Dr. Lominy completely unaware of the number of hours he worked, she

had no reason to know that Marcus worked overtime, or, as Plaintiff contends, paid himself for

fewer hours than he actually worked.  Assuming *arguendo* that Plaintiff was categorized as an

hourly employee, Plaintiff was entirely responsible for setting his hours, setting his hourly rate,

keeping track of his hours, and paying himself in accordance with these hours. As further

evidence of this, Plaintiff admits that he also paid Dr. Lominy for fewer hours than she

worked.[113] Dr. Lominy clearly did not "know or have reason to know" that Marcus was paying

---

[109] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 132-133.

[110] *See* Gilbride Decl., Ex. "C," Lopez Decl. ¶¶ 5-7.

[111] Marcus Decl. ¶ 13 & 15; Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 172:1-4; 173:12 – 174:24.

[112] Lominy Decl., Ex. "8," Kanner Dep. Tr. at p.110-111; 115:15-17; 116:15-17; 121:3-7; 122: 1-6, 19-22; 123:4-13; 124:7-10; 125:7-9128:14-18; 23-25; 129:1, 10-13; 132:10-20.

[113] Gilbride Decl., Ex. "A," Marcus Dep. Tr. at p. 123:9-11.

himself inaccurately, if she was not aware that she herself was paid at an hourly rate, for far less hours than she actually worked.

### D.  Plaintiff's Wage and Hour Claims are Time-Barred

The Fair Labor Standards Act ("FLSA") provides for a two-year statute of limitations period, which may be extended to three years upon a showing that the FLSA violations were willful. 29 U.S.C. § 255(a). The New York Labor Law ("NYLL") has a six-year statute of limitations period. NYLL § 663(3).

Plaintiff filed his Complaint on March 1, 2018. Accordingly, the longest limitations period for the NYLL claims is for the period March 1, 2012 through July 1, 2016, when Plaintiff's employment with PAM ended.  Any claims Plaintiff alleges prior to March 1, 2012 are time-barred. In addition, Plaintiff's FLSA claims prior to March 1, 2015 are outside of the limitations period.  See, *Colella v. City of New York*, 986 F.Supp.2d 320, 336 (S.D.N.Y 2013) (granting summary judgment to defendant on FLSA claims arising outside of the limitations period as time-barred).

### <u>CONCLUSION</u>

Plaintiff has failed to raise any triable issues of fact and Defendants are entitled to judgment as a matter of law.  For the foregoing reasons, summary judgment should be granted in favor of Defendants, and Plaintiff's motion for summary judgment should be denied.

Dated: August 6, 2020
         New York, New York

                                   Respectfully submitted,

                                   KAUFMAN BORGEEST & RYAN LLP


                                   _____
                                   Joan M. Gilbride
                                   *Attorneys for Defendants*
                                   120 Broadway, 14th Floor
                                   New York, New York 10271
                                   Telephone: (212) 980-9600
                                   jgilbride@kbrlaw.com

6642649

TO:    Jordan El-Hag, Esq.
        El-Hag & Associates, P.C.
        *Attorneys for Plaintiff*
        777 Westchester Ave, Suite 101
        White Plains, New York 10604
        Telephone: 914.218.6190
        Jordan@elhaglaw.com

6642649

# EXHIBIT  A

**GT** GreenbergTraurig

# Ownership of Medical Practices in New York and the Role of Private Investors



**One of the more interesting developments in the ever-shifting dynamics of the health care marketplace is the increasing interest on the part of private investors in developing financial relationships with or even purchasing equity interests in physician practices.**

By Francis J. Serbaroli | July 24, 2018 | New York Law Journal

One of the more interesting developments in the ever-shifting dynamics of the health care marketplace is the increasing interest on the part of private investors in developing financial relationships with or even purchasing equity interests in physician practices. For generations, medical practices were mostly small and mostly owned by the physician shareholders who treated their patients at the practices. As the health care marketplace has gravitated to new payment methods and different models of delivering care, there have been more consolidations of physicians into larger medical practices. Depending upon the medical specialty, these large medical practices can be very profitable, hence the interest of private investors in establishing a financial relationship with a practice.

While ownership by nonphysicians of interests in medical practices is legal in a few states, it is still strictly prohibited in New York. Nonphysician investors can invest in business entities that support the nonmedical aspects of a practice, but a medical practice located in New York must at all times be under the ownership and control of physicians licensed to practice medicine in New York.

© 2018 Greenberg Traurig, LLP



## Corporate Practice

New York Business Corporation Law (BCL) Section 1507 authorizes a professional service corporation (PC) to issue shares:

... only to individuals who are authorized by law to practice in this state a profession which such corporation is authorized to practice and who are or have been engaged in the practice of such profession in such corporation or a predecessor entity, or who will engage in the practice of such profession in such corporation within thirty days of the date such shares are issued.

Thus, the equity interests of any New York medical PC may be held only by individuals who are licensed to practice medicine in New York and who participate in the subject practice. Any shares issued in violation of BCL Section 1507 are void. In addition, the BCL precludes a shareholder from entering into any voting trust agreement, proxy or any other type of agreement that vests voting power in another person, other than another shareholder or a person who is a New York-licensed physician. In the case of a medical PC, this means that only a licensed physician can be a shareholder or have voting rights.

Similarly, New York Limited Liability Company Law (LLCL) Section 1207(b) requires that each member of a professional limited liability company (PLLC) formed to provide medical services must be licensed pursuant to New York Education Law (Ed. Law) Article 131 to practice medicine in New York. Article 131 permits only individuals to be licensed to practice medicine; it does not permit entities to be licensed to practice medicine. Therefore, the equity interests of any New York medical PLLC may be held only by individuals who are licensed to practice medicine in New York. Furthermore, pursuant to LLCL Section 1207(a), a member of a New York PLLC must provide services to the subject practice at the time such member acquires an equity interest in the PLLC or within 30 days of becoming a member of the PLLC. In other words, absentee ownership of a PC or PLLC is prohibited.

Only a physician licensed to practice medicine may own an equity interest in a New York PC that provides medical services. No other PC or PLLC may own an equity interest in a New York PC that provides medical services. However, a medical PC may be an owner of a medical PLLC. Medical practices may also be formed as professional partnerships or professional limited liability partnerships, but PCs and PLLCs are the more common ownership entities.

In addition to the BCL and LLCL restrictions, New York has a century-old prohibition on the corporate practice of medicine. This prohibition was extracted by the courts from the state's licensing statutes, and is based upon the premise that licenses to practice a profession, such as medicine, are granted to individuals and not corporations. It prohibits any business, partnership or unlicensed individual from employing or contracting with licensed physicians or other medical professionals to provide medical services to patients, or interfering in any way with the free exercise by those professionals of their own medical judgments. See. e.g., *United Calendar Manufacturing v. Huang*, 94 A.D. 2d 176 (App. Div. 2d Dept. 1983).

New York also has a prohibition on splitting fees for professional services by physicians with non-physicians, or with other physicians or licensed medical professionals who are not in a common medical practice such as a partnership, PC or PLLC. Most states have some form of this prohibition, but New York's is unusual in that it is found in both statute and regulation. Ed. Law Section 6530 includes among the definitions of professional misconduct:

**GT** GreenbergTraurig

18. Directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services;

19. Permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee ...

Ed. Law Section 6531 authorizes the suspension, revocation or annulment of a health care practitioner's license and other penalties if such professional:

... directly or indirectly requested, received or participated in the division, transference, assignment, rebate, splitting or refunding of a fee for, or has directly requested, received or profited by means of a credit or other valuable consideration as a commission, discount or gratuity, in connection with the furnishing of professional care or service ...

The regulations of the Department of Education at 8 N.Y.C.R.R. Section 29.1(b) define as unprofessional conduct:

- Directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services;

- Permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice the same profession, or a legally authorized trainee practicing under the supervision of a licensed practitioner. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a professional licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to Article 28 of the Public Health Law or Article 13 of the Mental Hygiene Law.

As unprofessional conduct, fee-splitting is punishable by revocation, suspension or annulment of the practitioner's license, and up to a $10,000 fine for each violation.

**Management Service Organizations**

With physicians having to see more patients and having less time to devote to the business side of the practice, so-called management service organizations (MSO) for medical practices have proliferated. MSOs offer medical practices the opportunity to outsource much of the practice's back office operations, thereby increasing the productivity of the practice's physicians.

An MSO is commonly a for-profit business corporation that provides the medical practice with a wide range of services and items needed by the practice. These can include office premises, medical and office equipment, and personnel and support services normally required for the operation of a medical practice. MSOs can provide or arrange for nonprofessional personnel such as a receptionist, medical records technicians, billing personnel, accounting services, hazardous waste disposal and janitorial services, telecommunications and information technology, and electricity and utilities. MSOs can also assist in

© 2018 Greenberg Traurig, LLP

 GreenbergTraurig

physician recruitment, negotiating contracts with third party payors, assuring compliance with Medicare/Medicaid laws and regulations, obtaining professional and general liability insurance, and many other services.

An MSO can be owned by physicians, non-physicians, other corporate entities, or a combination. However, the MSO's contractual relationship with the medical practice must be very carefully structured or it could run afoul of the laws and regulations cited earlier. An MSO makes a considerable financial investment in setting up its operations to support the medical practices it contracts to serve, including purchasing or leasing equipment, setting up billing and electronic medical record systems, hiring employees, and so on. In return, the MSO seeks a long-term contract with the practice and significant control over various aspects of the practice. If the MSO exercises too much control over the practice, it could place itself and the physicians it services in significant legal jeopardy.

Besides potentially violating the BCL and LLCL provisions discussed above, Ed. Law Section 6512(1) makes it a Class E felony to practice or offer to practice or to hold oneself out as being able to provide a licensed profession, or aids or abets an unlicensed person to practice a profession. If an MSO exercises pervasive control over the medical judgments of the physicians or other licensed professionals in the medical practice, the MSO could find itself accused of the unlicensed practice of a profession. Accordingly, not only should the medical PC or PLLC be owned exclusively by New York-licensed physicians, but all physicians, nurses, and other licensed health care professionals providing services to patients should be employed or contracted by the professional entity. The physicians practicing in the professional entity must be free at all times to exercise their own professional judgments in diagnosing and treating the practice's patients. The MSO may not interfere in any way with the licensed professionals' practice of their profession.

When organizing an MSO here are important points to keep in mind. An MSO that sets up a "captive" professional entity, whereby the MSO can remove a physician as the owner of the professional entity and replace him/her with another physician of the MSO's choosing will likely find that, if challenged, the arrangement will not withstand judicial scrutiny. Such an arrangement could be found to violate the provisions of the BCL or LLCL, as well as the prohibition on the corporate practice of medicine, in that it gives the MSO too much control over the medical practice.

The physician practice with which an MSO contracts must not cede control over the practice and its professionals to the MSO. The MSO as a general business corporation may not employ or directly supervise the practice's physicians, nurses or other licensed professionals. The MSO may not interfere with how those licensed professionals practice their professions. The MSO can make recommendations to the leadership of the physician practice regarding staffing, compensation, productivity, treatment or prescription utilization, quality assurance, and other aspects of the practice, but the final decision on all such matters must be made by the practice's physician leadership. Ownership of the practice's accounts receivable, medical records, controlled substances, and other assets directly related to the practice of medicine must remain with the physician owners of the practice.

In drafting the contract between the MSO and the physician practice, the MSO's fees should be structured as a flat fee, or on a fee-for-service or fee-for-item basis, and should be justifiable as representing fair market value for the services and items provided. MSO fees that are based simply on a percentage of the practice's gross or net income can violate the fee-splitting prohibition, can void the MSO agreement, and can constitute professional misconduct for which the physician owners of the practice can be disciplined and fined. While the MSO is not subject to the same professional disciplinary action, it could be at risk of having its contracts with the medical practice voided by the courts, thereby compromising the considerable investment it made in establishing its business.



*Reprinted with permission from the July 24, 2018 edition of New York Law Journal © 2018 ALM Media Properties, LLC. All rights reserved. Further duplication without permission is prohibited, contact 1.877.257.3382 or reprints@alm.com.*

**About the Author:**

**Francis J. Serbaroli** *is a shareholder in Greenberg Traurig and the former vice chair of The New York State Public Health Council.*



***Francis J. Serbaroli***
*SerbaroliF@gtlaw.com*

© 2018 Greenberg Traurig, LLP