UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAY MARCUS,

                              Plaintiff
                              Counter-Defendant,

        -against-

MARIE MICHELINE LOMINY and PEDIATRIC
ADOLESCENT MEDICINE LLC,

                              Defendants
                              Counter-Plaintiff.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __02/16/2022__

No. 18 Civ. 1857 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

        Plaintiff Jay Marcus commenced this action against Defendants Marie Micheline Lominy and Pediatric Adolescent Medicine, LLC ("PAM") (collectively, "Defendants"), asserting common law claims for breach of contract (or, in the alternative, promissory estoppel and/or unjust enrichment), and inadequate compensation and retaliation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 190 *et seq.*, and New York Labor Law ("NYLL"), N.Y. Lab. Law. §§ 190 *et seq.*, 650 *et seq*. Defendants asserted counterclaims for unjust enrichment and breaches of fiduciary duty and duty of loyalty. Presently pending before the Court is (1) Marcus's motion for summary judgment against Defendants on his claims for breach of contract, promissory estoppel, unjust enrichment, and inadequate compensation (ECF No. 99); and (2) Defendants' cross-motion for summary judgment against Marcus on those same claims (ECF No. 92). For the following reasons, the Court GRANTS Defendants' cross-motion and DENIES Marcus's motion.

## BACKGROUND

        The following facts are drawn from Marcus's Local Rule 56.1 Statement of Undisputed Material Facts ("SUMF", ECF No. 101-3), Defendants' Response to Plaintiff's Local Rule 56.1 Statement of Disputed Material Facts and Counterstatement of Undisputed Material Facts

("RCSUMF", ECF No. 94), the parties' declarations and exhibits, and are undisputed except as indicated.[1]

## I.    Factual Background

### A.    Undisputed Facts About Marcus and Lominy's Relationship

Lominy, a licensed pediatrician in New York, met Marcus in 2005 when she and her former husband hired Marcus's construction company to renovate their home.[2] Toward the end of the construction project, Lominy and Marcus developed an intimate relationship while each were married to other people.[3]

At some point in their relationship, Lominy and Marcus began commingling money, reason for which Marcus arranged to file the paperwork to form a limited liability company called the "Pic of Wall Street" in 2006.[4] Lominy was the sole shareholder of the Pic of Wall Street.[5] Marcus wanted to buy a home together, but he asked Lominy to put the home and the mortgage in her

---

[1] The Court notes that Marcus failed to provide any supporting citations to the record in his Rule 56.1 Statement of Material Facts. *See* S.D.N.Y. Local Civ. R. 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b) . . . must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). As such, the Court confines its review to evidence to which the parties have drawn its attention with specific citations to the record. As has been said repeatedly, "[J]udges 'are not like pigs[; they will not] hunt[ ] for truffles buried in briefs' or the record." *Potter v. Dist. of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

Moreover, Marcus also failed to respond to either *any* of Defendants' responses to his Rule 56.1 Statement or their Counterstatement of Material Facts. (*See* RCSUMF at 5–17). Under Local Rule 56.1, any portion of a defendant's Rule 56.1 statement that is properly supported, and that a plaintiff does not specifically deny with evidence, is deemed admitted for purposes of this motion. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003); *accord Gilani* v. *Teneo, Inc. et al.* No. 20-CV-1785 (CS), 2022 WL 220087, at *1 (S.D.N.Y. Jan. 25, 2022); *Universal Calvary Church v. City of N.Y.*, No. 96-CV-4606, 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 28, 2000); S.D.N.Y. Local Civ. R. 56.1(c).

[2] (Lominy Decl. ¶ 3, ECF No. 96; Marcus Dep. Tr. at 35:15–21, ECF No. 95-1; Marcus Decl. ¶ 6, ECF No. 102.)

[3] (Lominy Decl. ¶ 5; Marcus Dep. Tr. at 39:4–13, 44:7–15; Marcus Decl. ¶ 6.)

[4] (Lominy Decl. ¶ 5; Marcus Dep. Tr. 34:18–35:14, 44:7–15; Marcus Decl. ¶ 6; *see also* Marcus Decl., Ex. 4 (NYS Dep't of State Div. of Corps. Entity Information for The Pic of Wall Street, LLC), ECF No. 102-1.)

[5] (*See supra* note 4.)

name because his "credit was bad."[6]

### B.    Disputed Facts About Marcus and Lominy's Relationship and Alleged Agreement

According to Lominy, both she and Marcus pooled money in the Pic of Wall Street to purchase a home to reside together along with her children after they divorced their respective spouses.[7] Marcus invested those funds in various accounts to garner the best interest rate.[8] These funds were later withdrawn to purchase a home in 15 Fox Run Road in Croton-on-Harmon (the "Fox Run home"), and to place them into accounts opened in the name of  Lominy's medical practice—PAM—shortly after opening it.[9] Lominy avers that because they were romantically involved and Marcus had business experience, she "trusted him to make financial decisions" with these funds.[10]

But according to Marcus, after Lominy was unable to reach an agreement to take over other medical practices, Lominy decided to start her own and asked him to bankroll her "in starting a new practice."[11] For that main purpose, Marcus states that the couple formed the Pic of Wall Street.[12] Marcus asserts that he and Lominy also formed an agreement by which he "would bankroll her purchase and growth [of] a medical practice"[13] in exchange of having guaranteed

---

[6] (Marcus Dep. Tr. at 51:13–52:3.)

[7] (Lominy Decl. ¶¶ 5–6.)

[8] (*Id.* ¶ 6.)

[9] (*Id.* ¶¶ 12–13; Marcus Dep. Tr. at 70:9–71:7.)

[10] (Lominy Decl. ¶¶ 5–6.)

[11] (Marcus Decl. ¶ 7.)

[12] (*Id.* ¶ 7.)

[13] The Court notes that the assertions in paragraphs 8 and 9 of Marcus's declaration are inconsistent. Namely, Marcus first avers that he decided to bankroll Lominy in *starting* a new medical practice only after she was unable *to purchase* one with "the right fit." (*Id.* ¶ 8.) However, Marcus later avers that the alleged agreement was that he "would bankroll *her purchase and growth [of] a medical practice.*" (*Id.* ¶ 9.)

employment as the office manager, receive an hourly wage and fifty percent of the net revenues

of the practice on an annual basis.[14] Marcus further asserts that the term of the agreement was

> for the remainder of [his] or [Lominy's career]. If [Lominy] decided to end the practice, then [she] would have to provide [him] back the capital [he] provided to her and give [him] a bonus based on the practice sale price. If [Lominy] died and the practice simply dissolved, [he] would have lost the money [he] gave her.[15]

Marcus claims that the agreement also entailed that

> [he] would have no control or ownership in the practice. [Lominy] would be the sole owner of the business, and [he] would be an employee. [Lominy] would have all the voting rights; [he] had none. [Lominy] would be entirely responsible for the losses and obligations of the practice; [he] would not. [Lominy] would have decision making control over all aspects of the business; [he] would only be able to make recommendations to [Lominy]. The only restriction [Lominy] would have would be her contractual obligation to employ [him] as the practice manager pursuant to [their] financial arrangement.[16]

Based on this agreement, Marcus claims that he provided Lominy with start-up capital for

PAM, initially depositing $288,898.17 into the Pic of Wall Street, which would later be used to

open PAM.[17] Later, in September 2007, Marcus invested an additional $52,440.70 into PAM's

money market account.[18]

Lominy denies ever needing any "start-up" capital or that Marcus provided any "start-up"

capital or investment to start PAM.[19] She also denies ever having any intention of entering, or

actually entering into any agreement, either in writing, verbally, or implicitly with Marcus to start

---

[14] (*Id.* ¶ 9.)

[15] (*Id.*)

[16] (*Id.*)

[17] (*Id.* ¶ 10.)

[18] (*Id.*)

[19] (Lominy Decl. ¶ 8.)

PAM.[20] Lominy avers that had she done so, she would have risked her medical license because she knew that she could not split her fees with a non-physician.[21] Instead, Lominy avers that Marcus offered to provide non-financial support and that she accepted it because they were in a romantic relationship and "he had free time . . . and experience starting and operating businesses."[22] However, they never discussed a salary for him, what his function would be or how long he would be working at PAM.[23]

     C.    *Undisputed Facts About PAM*

In August 2007, Lominy started PAM as a private pediatric practice. [24] Marcus arranged for PAM's incorporation as a professional service liability company under Section 1203 of the Limited Liability Company Law with Lominy as its sole shareholder.[25] PAM's Articles of Organization state that PAM shall practice the profession of Medicine.[26] The State Education Department provided the required certificate confirming that Lominy was licensed to practice medicine when PAM was incorporated.[27] The Pic of Wall Street was dissolved that same month on August 20, 2007.[28]

PAM served the local community of Mount Vernon, New York, and Lominy's pediatric

---

[20] (*Id.*)

[21] (*Id.*)

[22] (*Id.* ¶ 10.)

[23] (*Id.*)

[24] (Lominy Decl. ¶ 7.)

[25] (Marcus Dep. Tr. at 57:10–16; Marcus Decl. ¶ 10, Ex. 6.)

[26] (Marcus Decl., Ex. 6.)

[27] (Gilbride Decl., Ex. B.)

[28] (Marcus Decl., Ex. 4.)

patients mainly lived in the local Mount Vernon community or the local Westchester community.[29] Due to an office take-over arrangement she had with another doctor, Lominy started her own practice in an office that was already equipped with the necessary equipment, furniture, and other basic materials.[30] PAM's lease included a list of furniture that came with the lease, including multiple chairs, paintings, tables, file cabinets, draw cabinets, consultation tables, refrigerator, sink, and some equipment.[31] PAM never had income or revenue more than $500,000.[32]

    D.    *Undisputed Facts About Marcus's Work in PAM*

Marcus acted as PAM's office manager from around August 10, 2007, through July 1, 2016.[33] Marcus understood his job duties as PAM's office manager to include managing the office, meeting with people, collecting mail, responding to mail, speaking to potential hires, meeting with insurance company, marketing, etc.[34] Marcus was also responsible for (1) processing the billing after Lominy "did her part," which was seeing the patients;[35] (2) keeping track of PAM's accounts receivable by posting through a software system licensed by STI;[36] (3) receiving, every 15 days, sheets that employees would fill out with the hours they worked;[37] (4) communicating with ADP, PAM's third-party payroll company, and he opened the ADP account under PAM and his name,

---

[29] (Lominy Decl. ¶ 11.)

[30] (*Id.*)

[31] (Marcus Decl., Ex. 7.)

[32] (Lominy Decl., Ex. 1 (PAM's tax returns).)

[33] (*See* Marcus Dep. Tr. at 82:6–13; Lominy Decl. ¶ 11; Lominy Dep. Tr. at 198:10–14; Kanner Dep. Tr. at 24:5–24, ECF No. 96-9; Lopez Decl. ¶ 9, ECF No. 101-12.)

[34] (Marcus Dep. Tr. at 82:14–19.)

[35] (*Id.* at 85:7–86:2.)

[36] (*Id.* at 86:24–87:21.)

[37] (*Id.* at 169:12–22.)

and knew the passcode to gain access to PAM's ADP account;[38] (5) reporting all the employees' hours, including his own, to ADP;[39] and (6) completing and providing to the other employees the Notice and Acknowledgement of Pay Rate and Payday under Section 195.1 of the NYLL Notice for Hourly Rate Employees, which he signed as the "Administrator."[40]

If Marcus thought an employee had not reported their work hours correctly, he would cross-reference their hours with their log-in and log-out hours on the computer system.[41] Marcus did not keep the same kinds of records for himself as he kept for the other employees.[42] Beginning sometime in late 2007 through December 2015, Marcus reported to ADP that his wages were at an hourly rate of $15.[43] Beginning December 2015 through July 1, 2016, Marcus reported to ADP that his wages had increased to $75 per hour.[44]

Besides wages, Marcus also received compensation in the form of "profit-sharing," amounting to fifty percent of PAM's profits.[45] Without an exact formula or time-basis, Marcus determined his "profit-sharing" compensation based on availability, feasibility, and the money available.[46] On average, Marcus took approximately between $40,000 and $60,000 per year from his "profit-sharing" compensation.[47]

---

[38] (*Id.* at 83:5–25.)

[39] (*Id.* at 112:7–16.)

[40] (*Id.* at 108:17–109:21; Lominy Decl., Ex. 2, ECF No. 96-2.)

[41] (Marcus Dep. Tr. at 171:4–9.)

[42] (*Id.* at 171:16–22.)

[43] (*See* SUMF ¶ 17; RCSUMF ¶ 17; Marcus Decl., Ex. 9 at 2–6, ECF No. 102-6.)

[44] (Marcus Decl., Ex. 9 at 6–9.)

[45] (Marcus Dep. Tr. at 116:15–19.)

[46] (*Id.* at 116:20–117:25.)

On October 15, 2014, Lominy emailed Marcus a letter she received from the Children's & Women's Physicians of Westchester ("CWPW") regarding a Confidentiality Agreement and preliminary discussions about a potential business relationship between her and CWPW.[48] Lominy offered Marcus the opportunity to move along with other PAM employees to BCHP, but he declined.[49] By that time, Lominy and Marcus had become estranged personally.[50] CWPW was subsequently renamed Boston Children's Health Physicians ("BCHP") in April 2016.[51] On July 1, 2016, Lominy became an employee of BCHP.[52] That same day, PAM ceased operations and neither had revenue nor any employees.[53]

Marcus did not have access to PAM's computer software system in which he handled payroll and accounts receivable after July 1, 2016.[54] Sometime in July 2016, Marcus first started printing his log-in and log-out record from the computer system.[55]

### E.    Disputed Facts About Marcus's Work in PAM

According to Marcus, he did not fully compensate himself "[t]o help PAM succeed."[56] Marcus states that he worked at least fifty-five hours every week because he was "solely

---

[47] (*Id.* at 124:2–4.) However, Marcus did not report any "profit-sharing" that he took from PAM as income on his personal tax returns. (*See* Kanner Dep. Tr. at 110–11; 115:15–17; 116:15–17; 121:3–7; 122:1–6, 19–22; 123:4–13; 124:7–10; 125:7–9; 128:14–18, 23–25; 129:1, 10–13; 132:10–20.)

[48] (Gilbride Decl., Ex. G.)

[49] (Lominy Decl. ¶ 22; Lopez Decl. ¶ 12.)

[50] (Lominy Decl. ¶ 22.)

[51] (*Id.* ¶ 20.)

[52] (*Id.* ¶ 21.)

[53] (*Id.* ¶¶ 21–22.)

[54] (Marcus Dep. Tr. at 172:5–14.)

[55] (*Id.* at 171:16–22.)

[56] (Marcus Decl. ¶ 15.)

responsible for managing and growing a new business[,] and that "Defendants only paid [him] for 20 hours each week."[57] He claims to have worked seven days a week, generally from 8 a.m. to 6 p.m. Monday through Friday, and for about 5-10 hours spread across Saturday and Sunday.[58]

After July 1, 2016, Marcus claims that he kept track of his hours at the suggestion of the New York State Department of Labor ("DOL").[59] He states that the DOL instructed him "not to quit because if [he] quit [his] job, [he] would lose certain rights, and that [he] should continue to work until instructed otherwise."[60] He states that the DOL also instructed to keep track of his hours.[61] Marcus also claims that Lominy was aware that he kept working between July 1, 2016, and October 13, 2016, and that even after she affiliated with BCHP, nothing changed as far as his office functions and duties.[62]

But Lominy denies all of Marcus's assertions regarding his work hours and inadequate compensation. Lominy states that Marcus generally arrived 9 or 9:30 a.m. and left by 4 or 5 p.m., rarely at 6 p.m., and that he was out of the office in the middle of the day from 11 a.m. or 12 p.m. until 1 p.m. or 2 p.m.[63] While Lominy agrees that she started offering Saturday hours, as Marcus avers, she states that Marcus was never present then.[64] She also claims that Marcus, without her knowledge or permission, gave himself a raise from an hourly rate of $15 to $75 in December

---

[57] (*Id.*)

[58] (*Id.*)

[59] (*Id.* ¶ 17.)

[60] (*Id.*)

[61] (*Id.*)

[62] (*Id.*)

[63] (Lopez Decl. ¶¶ 5–7.)

[64] (*Id.* ¶ 8.)

2015, and began paying himself sometimes as much 70 hours a week—earning, for instance, almost $50,000 for the first six months of 2016.[65]

Lominy also denies that Marcus kept working after July 1, 2016. She states that Mayra Lopez took over many of Marcus's responsibilities starting on July 1, 2016.[66] While she agrees, that Marcus continued to go to the office, as Marcus avers, Lominy states that he did not perform any more work for her or PAM (which was no longer active), and that he had a computer he used to work on his other businesses.[67] She further asserts that Marcus's time records starting from July 1, 2016 are fictional time records because he never tracked his time since 2007, but then began to do so after PAM was no longer active.[68] She also states that Marcus simply stopped coming into the office in October 2016.[69]

### F.    Undisputed Facts about the Fox Run Home and the 88 West Lincoln Building

In May 2010, Marcus withdrew funds from PAM's accounts to purchase the Fox Run home.[70] In 2012, the couple purchased a commercial building located on 88 West Lincoln (the "88 West Lincoln building") so that they could eventually move PAM into an office space in that building and to receive rental income.[71] Marcus and Lominy formed a profit-sharing agreement, each for fifty-percent of the profits from the 88 West Lincoln building, for which they entered into a written contract.[72]

---

[65] (Lominy Decl. ¶ 22.)

[66] (*Id.* ¶ 23; Lopez Decl. ¶ 12; Gilbride Decl., Ex. C.)

[67] (Lominy Decl. ¶ 23.)

[68] (*Id.*)

[69] (*Id.*)

[70] (*Id.* ¶ 13; Kanner Dep. Tr. at 49-54; Marcus Dep. Tr. 148:19-149.)
[71] (Lominy Decl. ¶ 14, Ex. 9 (88 West Lincoln Operating Agreement); Marcus Decl. ¶ 14.)

[72] (*See supra* note 71.)

G.    *Procedural History*

Marcus filed his complaint on March 1, 2018. (ECF No. 1.) Defendants filed their original answer on April 30, 2018. (ECF No. 9.) On July 27, 2018, the case was referred to Magistrate Judge Lisa Margaret Smith for general pretrial matters such as discovery and non-dispositive pretrial motions. (ECF No. 12.) Defendants then filed an amended answer asserting counterclaims for unjust enrichment and breaches of fiduciary duty and duty of loyalty on November 18, 2019. (ECF No. 54.) Marcus filed his answer to Defendants' counterclaims and asserted "counterclaims"[73] of his own for retaliation. (ECF No. 56.) Defendants filed a response to Marcus's "counterclaims" on December 6, 2019. (ECF No. 58.) On October 17, 2020, the case was redesignated to Magistrate Judge Andrew E. Krause.

On October 19, 2020, the parties filed their respective briefing presently pending before the Court: Defendants their cross-motion for summary judgment (ECF No. 92), memorandum in support ("Cross-Motion," ECF No. 92), Rule 56.1 Statement and Counterstatement (ECF No. 94), exhibits in support (Gilbride Decl., ECF No. 95; Lominy Decl., ECF No. 96), and their cross-reply memorandum ("Cross-Reply", ECF No. 97); and Marcus his motion for summary judgment (ECF No. 99), memorandum in support ("Motion," ECF No. 100), exhibits in support (El-Hag Decl., ECF No. 101; Marcus Decl., ECF No. 102; Kanner Decl., ECF No. 103), memorandum in opposition to the Cross-Motion ("Resp. in Opp'n," ECF No. 106), and opposition exhibits (Marcus

---

[73] Marcus's labeling of his retaliation claims as "counterclaims" is incorrect because the Federal Rules of Civil Procedure in general, and particularly Rule 7, "do not contemplate a counterclaim to a counterclaim." *Brooks v. Bates*, 781 F. Supp. 202, 207 (S.D.N.Y. 1991); *see also* Fed. R. Civ. P. 7. Any such "reply counterclaims" may only be permissible through a Rule 15(a) motion to amend a pleading. *See United Mag. Co. v. Murdoch Mags. Distributors, Inc.*, No. 00 CIV. 3367(AGS), 2003 WL 223462, at *3 (S.D.N.Y. Feb. 3, 2003) (citing *Brooks*, 781 F. Supp. at 207; *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970); *United States v. Heyward–Robinson Co.*, 430 F.2d 1077 (2d Cir. 1970); *American Elastics v. United States*, 187 F.2d 109 (2d Cir. 1951)). In other words, Marcus should have moved for leave to amend his complaint for him to assert his retaliation claims against Defendants. As the instant motions do not involve Marcus's retaliation claims, the Court leaves this issue pending for another day during which the parties shall have an opportunity to provide their respective positions and arguments on the matter.

Decl. in Opp., ECF No. 107; Kanner Second Decl., ECF No. 109; El-Hag Decl. in Opp., ECF No. 110.)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment must be granted if "there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is

not significantly probative, summary judgment may be granted.*" Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

The same standard of review applies when the Court is faced with cross-motions for summary judgment, as here. *See Lauria v. Heffernan*, 607 F. Supp. 2d 403, 407 (E.D.N.Y.2009) (citations omitted). When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

## DISCUSSION

By his motion, Marcus argues that the record (1) establishes that he and Lominy formed a lawful employment contract and that she breached this contract upon terminating Marcus's employment, (Mot. at 15–20), or, alternatively, that equitable relief based on either promissory estoppel or unjust enrichment is warranted, (*id.* at 20–26); and (2) establishes that he is covered by the FSLA and NYLL, and that Defendants underpaid him in violation of those laws, (*id.* at 26–32).

In contrast, by their cross-motion, Defendants contend that: (1) Marcus's breach of contract claim fails because they deny the existence of an alleged oral agreement, and even if existent, such contract is either an unenforceable, illegal contract or barred by the statute of frauds, (Cross-Mot. at 15–17); (2) Marcus's claims for equitable relief fail either under the doctrine of unclean hands or based on his failure to raise triable issues of fact, (*id.* at 24–28); and (3) Marcus's wage and hour claims are meritless because he fails to show he is covered under the FLSA, and even if covered, he is also exempt under the executive and/or administrative exceptions under both the FLSA and NYLL, (*id.* at 27–37). The Court addresses those arguments in that order.

13

## I.  Breach of Contract

Marcus claims that he formed an oral contract with Lominy in which he agreed to bankroll her medical practice in exchange for employment as an office manager, at an hourly rate, and splitting fifty percent of the net revenues of the medical practice on an annual basis. (Mot. at 18.) He claims that the alleged contract would last for the remainder of either Marcus's or Lominy's career: if Lominy decided to end the practice, then she would have to return Marcus his investment and give him a bonus based on the sale price; but if Lominy died and the practice dissolved, then Marcus would be out of luck. (*Id.* (citing Marcus Decl. ¶ 9.)).

But Defendants deny the existence of such oral agreement. Further, they contend that such oral agreement is unenforceable because (1) it constitutes an illegal contract under New York Education Law, which prohibits, *inter alia*, fee-splitting agreements between individuals authorized to practice medicine and those who are not, (Cross-Mot. at 16–20); (2) even if not an illegal contract, the record contains no evidence supporting a finding that the parties mutually assented to such oral agreement, (*id.* at 20–23); and (3) it is barred by the statute of frauds because the agreement could not be performed within one year, (*id.* at 23–24).

After due consideration, even after viewing the evidence in his favor, the Court concludes that Marcus fails to adduce sufficient evidence from which a reasonable fact-finder could conclude that the terms of the alleged oral contract are sufficiently definite for it to be legally enforceable. Further, even when assuming the existence of the oral contract and that its terms are sufficiently definite for enforceability, the Court agrees with Defendants that the alleged oral contract is an illegal, unenforceable contract as a matter of law.

14

A.   *Existence of an Oral Agreement*

To make out a breach of contract claim under New York law,[74] a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Eternity Global Master Fund v. Morgan Guar. Trust Co.*, 375 F.3d 168, 177 (2d Cir. 2004) (citation omitted). New York law recognizes oral agreements as binding on the parties. N.Y. Gen. Oblig. § 5–701. Formation of such a contract is determined by the parties' objective expressions of intent, including their words and actions. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 74 (2d Cir. 1984); *Haskell Co. v. Radiant Energy Corp.*, No. 05–CV–4403, 2007 WL 2746903, at *8 (E.D.N.Y. Sept. 19, 2007) (citing *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985). "[A] primary concern for courts in [disputes involving oral agreements] is to avoid trapping parties in surprise contractual obligations that they never intended." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989). As such, the parties' intent should be discerned from the totality of the circumstances. *See R.G. Group*, 751 F.2d at 74 ("What matters are the parties' expressed intentions, the[ir] words and deeds which constitute objective signs in a given set of circumstances."); *Bd. of Trustees of Sheet Metal Workers v. Vic Constr. Corp.*, 825 F. Supp. 463, 466–67 (E.D.N.Y. 1993).

As in all other contracts, oral contracts require definiteness: "Before a court will impose a contractual obligation based on an oral contract, the proponent must establish that a contract was made and that its terms are definite." *Muhlstock v. Cole*, 666 N.Y.S.2d 116, 119 (1st Dep't 1997) (citing *Charles Hyman, Inc. v. Olsen Indus.*, 642 N.Y.S.2d 306, 309 (1st Dep't 1996)). "[F]or a contract to be valid, the agreement between the parties must be definite and explicit so their

---

[74] Both parties rely solely on New York law in their moving papers. Where the parties' briefs assume that New York law controls, such "implied consent" is sufficient to establish choice of law. *Gutkowski v. Steinbrenner*, 680 F. Supp. 2d 602, 609 n.2 (S.D.N.Y. 2010) (citing *Nat'l Utility Serv., Inc. v. Tiffany & Co.*, No. 07 Civ. 3345(RJS), 2009 WL 755292, at *6 n. 6 (S.D.N.Y. Mar. 20, 2009)). Accordingly, the Court applies New York law.

intention may be ascertained to a reasonable degree of certainty." *Candid Prods., Inc. v. Int'l Skating Union*, 530 F. Supp. 1330, 1333 (S.D.N.Y. 1982). "The doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to." *Dreyfuss v. eTelecare Global Solutions–US, Inc.*, No. 08 Civ. 1115 (RJS), 2008 WL 4974864, at *4 (S.D.N.Y. Nov. 19, 2008) (quoting *166 Mamaroneck Ave. Corp. v. 151 E. Post Rd. Corp.*, 78 N.Y.2d 88, 91 (1991), *aff'd sub nom. Dreyfuss v. Etelecare Global Solutions–U.S. Inc.*, 349 F. App'x 551 (2d Cir. 2009). "[I]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Id.* (quoting *166 Mamaroneck Ave.*, 78 N.Y.2d at 91); *see also Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 95 (2d Cir. 2007) ("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (citing *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 589 (1999)).

Here, when viewing the evidence in Marcus's favor, a reasonable fact-finder could conclude that Marcus and Lominy had formed some kind of employment agreement. Defendants are correct that the record contains no evidence of communications between the parties indicating whether they intended to be bound by an oral agreement. Moreover, it is undisputed that Marcus and Lominy entered into a written contract when they agreed to split the profits from the 88 West Lincoln building, which strongly suggests that the parties would have similarly done so for the alleged oral contract. However, a reasonable fact-finder could still infer from Marcus's partial performance as PAM's office manager for nine years that the parties understood some kind of employment agreement to be in place. Namely, Marcus conferred benefits to Defendants in the form of his performance as an office manager, and Defendants accepted those benefits from

Marcus for several years. *See Shearson Lehman CMO, Inc. v. TCF Banking and Savings, F.A.*, 710 F. Supp. 67, 71 (S.D.N.Y. 1989) (holding that, for there to be partial performance, a party must confer a thing of value on the other party which that party accepts).

Yet, even when drawing all inferences in his favor and assuming that the parties formed the alleged oral agreement, Marcus still fails to establish that the terms of the contract were sufficiently definite for it to be legally enforceable. Notably, Marcus claims that the terms of the contract were that he would bankroll Lominy's medical practice in exchange for employment as an office manager, *at an hourly rate*, and *splitting fifty percent of the net revenues of the practice on an annual basis.* (*See* Marcus Decl. ¶ 9.)

"The consideration to be paid under a contract is a material term." *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 326 (S.D.N.Y. 2009); *accord Major League Baseball Props., Inc. v. Opening Day Prods., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005) ("Price or compensation are material terms in a contract requiring definiteness."); *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 23 F. Supp. 2d 287, 293–94 (E.D.N.Y. 1998) (collecting cases). In other words, "[a]s price is an essential ingredient of every contract for the rendering of services, an agreement must be definite as to compensation." *Cooper Square Realty, Inc. v. A.R.S. Mgmt. Ltd.*, 581 N.Y.S.2d 50, 51 (1st Dep't 1992). "The failure to fix a sum certain, however, is not necessarily fatal to a contract." *GEM Advisors*, 667 F. Supp. 2d at 326. The New York Court of Appeals has held that:

> [A] price term is not necessarily indefinite because the agreement fails to specify a dollar figure, or leaves fixing the amount for the future, or contains no computational formula. Where at the time of agreement the parties have manifested their intent to be bound, a price term may be sufficiently definite if the amount can be determined objectively without the need for new expressions by the parties; a method for reducing uncertainty to certainty might, for example, be found within the agreement or ascertained by reference to an extrinsic event, commercial practice

or trade usage. A price so arrived at would have been the end product of agreement between the parties themselves.

*Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 483 (N.Y. 1989) (citations and internal quotation marks omitted).

First, regarding the alleged oral contract's hourly rate provision, the Court concludes that a material dispute of fact exists as to whether he and Lominy had mutually assented to a sufficiently definite hourly rate for the contract to be enforceable. To be sure, a reasonable fact-finder could infer from Marcus's payroll records evincing his partial performance, together with the absence of Lominy's objection to his $15 and $75 hourly rates throughout the years, that the couple may have mutually assented to such definite hourly rates as Marcus claims. However, the record indisputably shows that Marcus was the individual in charge of compensation at PAM and the one who reported his own payroll—his own hourly rates—to ADP.[75] Additionally, it is undisputed that Marcus considered himself a "founder" of PAM.[76] Hence, a reasonable fact-finder could also conclude from these facts that Marcus had unfettered discretion to unilaterally modify his hourly rate, rendering the alleged oral agreement illusory. *See Lend Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684 (N.Y. 2017) ("An illusory contract is 'an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation.'" (citation omitted)). Put another way, a reasonable fact-finder could conclude that Lominy's alleged promise of an undefined hourly rate is so indefinite and insubstantial as to allow Marcus to unilaterally determine whichever rate he wished.

And more to the point, to the extent that the definiteness of Marcus's hourly rate is wholly supported by self-serving evidence (namely, all purported business records that Marcus prepared

---

[75] (Marcus Decl., Ex. 9 at 2–6.)

[76] (Marcus Decl., Ex. 6 (Meeting Minutes containing remark that Marcus was a "founder/manager.")

and maintained as PAM's office manager), then the inquiry strictly depends on Marcus's credibility—precisely what the Court must refrain from doing at summary judgment. *See Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1119 (S.D.N.Y. 1993), *aff'd*, 32 F.3d 690 (2d Cir. 1994) ("The hallmark of documents admitted under the business records exception [under Fed. R. Evid. 803(6)] is that they are trustworthy and reliable." (citing *Saks Int'l, Inc. v. M/V "Export Champion"*, 817 F.2d 1011, 1013 (2d Cir. 1987)); *see also Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942) (excluding an accident report made by a deceased railroad engineer, offered by the defendant railroad trustees in the defense of a grade-crossing collision case because "by its very nature, [the report was] dripping with motivations to misrepresent."), *aff'd,* 318 U.S. 109 (1943).

However, this seemingly material dispute of fact does not preclude summary judgment against Marcus's breach of contract claim. Even when resolving such factual dispute in his favor, the record shows that Marcus himself is considerably inconsistent on the details of the fee-splitting provision. For instance, in his Complaint dated March 1, 2018, Marcus first alleged that Lominy agreed to pay him "on *an annual basis*[,] 50% of the medical practice's net profits as additional compensation." (Compl. ¶ 30 (emphasis added).) But then, at his deposition on October 2, 2019, Marcus was uncertain and equivocal about when and how he would take his half from PAM's medical profits:

> Q. Did you receive compensation other than wages?
>
> A. Yes, I did as well.
>
> Q. What kind of compensation was that?
>
> A. Profit sharing, as I had just stated earlier.
>
> Q. Was that profit sharing received on an annual basis, a monthly basis? How did it get delivered to you?

19

A. I stated a few minutes earlier, profit sharing over the years have been made, whether a check is written to myself or to . . . Lominy or to a third party for . . . Lominy, to a third party for . . . Marcus or any other form of compensation that we'll call profit sharing. There was no exact formula, but the record will show on a constant basis, year after year, on profit sharing, and it was on a 50/50 percent profit sharing.

. . .

Q. Who made the determination of how much money went to you and how much went to Dr. Lominy?

A. There was no determinations. Let's say one week or one month I had a need or . . . Lominy had a need, a check is written to her or to myself or to something for herself or something for myself. So there was no -- based on availability, based on feasibility, based on money available, then there was no, I want this, this month. If there is, there is. If there isn't, there isn't. But it was a pattern from whenever it started until she breached the contract that I had with her.[77]

Evidently, Marcus's testimony is inconsistent with his allegation that the couple split the medical profits on *an annual basis* because he would instead take his purported half whenever there was "money available."[78]

Not only then, but also now when moving for summary judgment, Marcus contradicts himself on the details of the fee-splitting provision in the alleged oral contract. Throughout his briefing and declaration filed under penalty of perjury, Marcus asserts that he and Lominy had agreed to split "*net revenues*" instead of "*net profits*" as he had initially claimed in his Complaint and deposition testimony.[79] Notably, these two accounting concepts are not interchangeable because they have substantially different definitions. *Compare* Black's Law Dictionary Online, *Net Revenue*, https://thelawdictionary.org/net-revenue/ (last visited Feb. 9, 2022) ("Any returns

---

[77] (Marcus Dep. Tr. at 116:15–117:25.)

[78] (*Id.*)

[79] (*See, e.g.*, Mot. at 8, 10, 11, 18, 25; Marcus Decl. ¶ 9.)

and any other negative revenue subtracted from gross total.") *with* Black's Law Dictionary Online, *Net Profit*, https://thelawdictionary.org/net-profit/ (last visited Feb. 9, 2022) ("[T]he profit that remains after all of the expenses, taxes and liabilities have been paid."). Indeed, Marcus's counsel himself rebuked Defendants' counsel for using the word "profit" loosely at Marcus's deposition.[80] This stark difference is particularly crucial in this case because the Court "cannot enforce a contract unless it is able to determine what in fact the parties have agreed to." *Dreyfuss*, 2008 WL 4974864, at *4 (quoting *166 Mamaroneck Ave. Corp.*, 78 N.Y.2d at 91).

Thus, the Court concludes that Marcus has failed to adduce evidence from which a reasonable fact-finder could determine that the fee-splitting provision from the alleged oral contract was sufficiently definite for the Court to enforce it. And by extension, as neither party raised any severability issues,[81] the Court concludes that even when assuming the existence of the alleged oral contract, Marcus fails to establish that the alleged oral contract was sufficiently definite for it to be legally enforceable.

But further, even if the Court were to assume that an oral agreement existed and that all its terms were sufficiently definite for it to be legally enforceable, for the reasons that follow, the Court nonetheless concludes that such agreement is illegal and unenforceable as a matter of law.

### B.    Illegal, Unenforceable Fee-Splitting Contracts

Contrary to Marcus's assertion that "[t]here is no case law upholding the Defendants' position," (Resp. in Opp'n at 18), "it is the established public policy of [the State of New York]

---

[80] (Marcus Dep. Tr. at 113:15–23.)

[81] Where a provision of a contract is unenforceable because of an indefinite term, the whole contract is unenforceable unless the contract is severable. *See Mellencamp v. Riva Music Ltd.*, 698 F. Supp. 1154, 1162 (S.D.N.Y. 1988). A contract is generally considered to be entire, as opposed to severable, when, by its terms and purposes, it contemplates that all of its parts are interdependent and common to one another. *See GEM Advisors, Inc.*, 667 F. Supp. 2d at 327. A contract will only be regarded as severable if "(1) the parties' performances can be apportioned into corresponding pairs of partial performances, and (2) the parts of each pair can be treated as agreed equivalent." *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1098 (2d Cir. 1992) (citing Restatement (Second) of Contracts § 240).

that medical providers may not engage in voluntary prospective fee-splitting arrangements." *Sheldon Rabin, M.D. v. Hirshfield*, 636 N.Y.S.2d 117, 118 (2d Dep't 1996). "This proscription against fee-splitting does not extend to a *licensed* professional associated with or employed by a professional corporation formed to provide medical services." *Id.* (emphasis added). "Thus, a physician can provide services through a corporation, but that corporation must be a professional corporation owned by licensed physicians." *See id.* Such proscription comes from the statutory language in New York's Education Law § 6530(19), which defines professional misconduct for physicians as including:

> Permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law.

In turn, section 6531 calls for license revocation or suspension upon a finding

> [t]hat any person subject to the above-enumerated articles has directly or indirectly requested, received or participated in the division, transference, assignment, rebate, splitting, or refunding of a fee for, or has directly requested, received or profited by means of a credit or other valuable consideration as a commission, discount or gratuity, in connection with the furnishing of professional care or service . . . .

"It is well settled that where a commercial relationship among parties constitutes an unlawful fee-splitting arrangement in violation of Education Law § 6530(19) . . . , it will not be enforced by the court." *Avigdor v. Rosenstock*, 16 N.Y.S.3d 791 (Table) (N.Y. Sup. Ct. 2015) (citing *South Shore Neurologic Assoc., P.C. v. Mobile Health Mgt. Servs., Inc.*, 995 N.Y.S.2d 93, 94 (2d Dep't 2014); *LoMagno v. Koh*, 667 N.Y.S.2d 280, 280–81 (2d Dep't 1998); *Hartman v. Bell*, 524 N.Y.S.2d 477, 478 (2d Dep't 1988); *United Calendar Mfg. Corp. v. Huang*, 463 N.Y.S.2d

497, 500 (2d Dep't 1983). Consequently, any such agreement is unenforceable because "[i]t is the settled law of [the State of New York] (and probably of every other State) that a party to an illegal contract . . . cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose." *Huang*, 463 N.Y.S.2d at 500 (citing *Stone v Freemen*, 298 N.Y. 268, 271 (N.Y. 1948); *Barker v. Kallash*, 459 N.Y.S.2d 296, 296 (2d Dep't 1983), *aff'd*, 63 N.Y.2d 19 (N.Y. 1984); *Braunstein v. Jason Tarantella, Inc.*, 450 N.Y.S.2d 862, 862 (2d Dep't 1982)).

Notwithstanding, Marcus argues that these state courts' interpretation of the relevant statutory language is inconsistent with certain canons of statutory interpretation. (*See* Resp. in Opp'n at 13–16.) But Marcus overlooks two well-settled principles of law. First, "when interpreting state statutes[,] federal courts defer to state courts' interpretation of their own statutes." *United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002) (citing *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam) ("As a general rule, this Court defers to a state court's interpretation of a state statute."); *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 119 (2d Cir. 2001) (noting that "we must defer to the [state] [s]upreme [c]ourt on issues of state law")). And second, "[b]ecause they are supreme in their power, under state law, to decide the meaning of state statutes, state courts are neither bound to follow, nor limited by, federal canons of interpretation[.]" *Tunick v. Safir*, 209 F.3d 67, 76 (2d Cir. 2000).

In the alternative, Marcus asks that the Court not "interpret the statutes to limit fee sharing to only medical practice employees who hold medical licenses" because, if the Court adopts Defendants' interpretation, the result would be absurd as "[m]ost medical practices . . . employ non-licensed staff who receive pay and most major hospitals in the N.Y. Metropolitan region give substantial bonuses to non-licensed executives." (Resp. in Opp'n at 16.)  He contends that because

"[e]mployee bonuses are necessarily tied to the profitability of any organization," the Court ruling that "paying an employee a portion of revenues is unlawful fee-splitting" would mean that "all of . . . [the] major medical institutions are violating the law." (*Id.* at 17.) But such argument is misplaced.

To begin, the record does not require the Court to rule on the applicability of the relevant statutes with respect to employee bonuses. The terms of the purported oral agreement here provide for a "50/50" fee-splitting arrangement—not a bonus. Furthermore, Marcus's argument presumes that medical institutions exclusively tie their employees' bonuses to their profitability instead of, for example, flat rates awarded based on the employees' performance in the workplace and that are not otherwise "dependent upon, the income or receipts of the licensee from such practice." N.Y. Educ. Law § 6530 (19). Hence, Marcus fails to provide any persuasive argument as to why the Court must not defer to the New York state courts' construction of their own statutes.

As such, even when assuming that the oral agreement between him and Lominy existed, the contract would be illegal under New York law, and thus, unenforceable as a matter of law. Therefore, the Court grants summary judgment against Marcus's claim for breach of contract.

## II. Equitable Relief Under a Quasi-Contract Theory

On a similar basis, Marcus's request for equitable relief under a quasi-contract theory, such as promissory estoppel or unjust enrichment, must necessarily fail. *See, e.g.*, *Toffler v. Pokorny*, 598 N.Y.S.2d 445, 448 (N.Y. Sup. Ct. 1993) ("As a licensed professional voluntarily participating in this type of unethical arrangement for splitting a fee, a non-affiliated professional is not entitled to recover under the theory of unjust enrichment." (citing *Sachs v. Saloshin*, 526 N.Y.S.2d 168 (2d Dep't 1988)); *see also Zador v. Millard Fillmore Hosp.*, 689 N.Y.S.2d 816, 817–18 (4th Dep't 1999) (concluding that, assuming that the contractual fee agreement in that case was an improper

fee-splitting agreement under N.Y. Education Law, "plaintiff would not be entitled to recover in equity.").

Indeed, the undisputed record here supports a finding that Marcus's claims for equitable relief are also barred by the doctrine of unclean hands. *See Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) ("The unclean hands [doctrine] is an 'ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief.'"); *see also Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 560 (S.D.N.Y. 2009) ("It is well-established that a court of equity will not exercise its power in favor of a plaintiff whose actions show inequitable conduct or bad faith where the misconduct has a material relation to the equitable relief that plaintiff seeks." (citing *Motorola Credit Corp. v. Uzan*, 561 F.3d 123 (2d Cir. 2009); *Specialty Minerals, Inc. v. Pluess–Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005)). Notably, the record contains evidence indicating that Marcus was aware that fee-splitting agreements with medical providers were prohibited under New York law.[82] It also contains evidence strongly suggesting that Marcus attempted to conceal the nature of his proceeds from the alleged fee-splitting arrangement with Lominy.[83] Therefore, the Court grants summary judgment against Marcus's claims for equitable relief.

### III. FLSA and NYLL Claims

Marcus next claims that Defendants underpaid him in violation of the FLSA and NYLL. Specifically, Marcus claims that Defendants failed to adequately pay him minimum wage,

---

[82] (*See* Kanner Second Decl. ¶ 14, ECF No. 109; *id.*, Ex. K-2, ECF No. 109-2 (email correspondence between Kanner and Marcus regarding fee-splitting arrangements).)

[83] (*See* Marcus Dep. Tr. at 124:5–125:25 (asserting Fifth Amendment right after being asked whether he reported any profit sharing to the Internal Revenue Service); *see also* Kanner Dep. Tr. at 110–11; 115:15–17; 116:15–17; 121:3–7; 122:1–6, 19–22; 123:4–13; 124:7–10; 125:7–9; 128:14–18, 23–25; 129:1,10–13; 132:10–20 (noting that Marcus's tax returns for the years that he acted as PAM's office manager do not reflect any additional compensation aside from his wages.)

overtime, and the full extent of the hours he worked. (Mot. at 26–32.) But Defendants counter that Marcus's claims under the FLSA and NYLL are meritless because he fails to establish coverage under the FLSA. (Cross-Mot. at 27–30.) Defendants further argue that, if the Court finds coverage under the FLSA, summary judgment against his claims is still proper because Marcus is an employee exempt from overtime and minimum wage requirements under both the FLSA and NYLL. (*Id.* at 30–34.) They also contend that even if not exempt, Marcus fails to raise a triable issue of fact on his claims under the FLSA and NYLL. (*Id.* at 34–37.)

After due consideration, the Court concludes that (1) Marcus has failed to establish that he is covered employee under the FLSA; (2) Defendants have established that the record indisputably shows that Marcus is an employee exempt from the overtime and minimum wage requirements under both the FLSA and NYLL; and (3) Marcus's claims against Defendants under the NYLL for failure to pay him the full extent of the hours he worked must be dismissed.

A.      *FLSA and NYLL*

The FLSA was enacted by Congress to "protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for the health, efficiency, and general well-being of workers.'" *Barrentine v. Arkansas-Best Freight Sys. Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)). Particularly relevant here, section 206 of the FLSA sets forth the minimum hourly wage that employers must pay their employees. 29 U.S.C. § 206(a)(1)(C). Additionally, section 207 specifies that an employer must pay employees who work more than forty hours during a workweek for the excess hours "at a rate not less than one and one-half times the regular rate at which [they are] employed." 29 U.S.C. § 207(a)(1).

To establish a claim under the FLSA, a plaintiff must first show that: "(1) the defendant is an enterprise participating in commerce or the production of goods for the purpose of commerce;

(2) the plaintiff is an 'employee' within the meaning of the FLSA; and (3) the employment relationship is not exempted from the FLSA." *Accosta v. Lorelei Events Grp. Inc.*, No. 17-CV-07804 (NSR), 2022 WL 195514, at *3 (S.D.N.Y. Jan. 21, 2022) (citations omitted). The NYLL standards are analogous, except that the NYLL "does not require a plaintiff to show either a nexus with interstate commerce or that the employer has any minimum amount of sales." *Gomez v. El Rancho de Andres Carne de Tres Inc.*, No. 12-CV-1264 (CBA)(MDG), 2014 WL 1310296, at *5 (E.D.N.Y. Mar. 11, 2014) (quoting *Chun Jie Yin v. Kim*, No. 07-CV-1236 (DLI)(JO), 2008 WL 906736, at *4 (E.D.N.Y. Apr. 1, 2008)).

Here, Defendants do not dispute that Marcus satisfies the second prong. Instead, Defendants argue that Marcus's FLSA claims fail under both the first and third prongs, and his NYLL claims fail under the third prong (as the first prong does not apply to NYLL claims). Consequently, because the NYLL is the state analogue to the federal FLSA and it mirrors the FLSA in compensation provisions regarding minimum hourly wages and overtime, the Court's ensuing analysis on the third prong will solely focus on federal law but applies equally to Marcus's claims under the FLSA and the NYLL. *See Debejian v. Atl. Testing Labs., Ltd.*, 64 F. Supp. 2d 85, 87, n. 1 (N.D.N.Y. 1999) (minimum wage); *Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 289 n.5 (E.D.N.Y. 2010) (overtime) (citing *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 78 (2d Cir. 2003)).

B.     *First Prong - FLSA Coverage*

To establish the first prong, a plaintiff must show that he is an employee covered by the FLSA. *See Owusu v. Corona Tire Shop, Inc.*, No. 09–CV–3744, 2013 WL 1680861, at *3 (E.D.N.Y. Apr. 17, 2013) ("[T]he employee bears the burden of establishing his individual coverage [under the FLSA].") FLSA coverage applies "only to employees who are (1) personally engaged in interstate commerce or in the production of goods for interstate commerce (so-called

'individual coverage'), or (2) employed in an enterprise engaged in interstate commerce or in the production of goods for interstate commerce (so-called 'enterprise coverage')." *Rodriguez v. Almighty Cleaning, Inc.*, 784 F. Supp. 2d 114, 120 (E.D.N.Y. 2011) (internal quotation marks and alterations omitted) (citing *Shim v. Millennium Group*, No. 08–CV–4022, 2009 WL 211367, at *2 (E.D.N.Y. Jan. 28, 2009); *see also* 29 U.S.C. §§ 206(a), 207(a)). "[T]he failure of the plaintiff to demonstrate an issue for trial involving employee coverage, based on either the enterprise or individual theory, is a proper basis for dismissing his FLSA claim on summary judgment." *Jian Long Li v. Li Qin Zhao*, 35 F. Supp. 3d 300, 305 (E.D.N.Y. 2014) (citations omitted).

### 1.  Enterprise Coverage

To prove that he is the employee of an "enterprise engaged in commerce or in the production of goods for commerce," the plaintiff must establish that his employer is an "enterprise" (i) which "has employees engaged in commerce or in the production of goods for commerce, or . . . employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person"; and (ii) "whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)." 29 U.S.C. § 203(s)(1)(A); *see also Archie v. Grand Cent. P'ship, Inc.*, 997 F. Supp. 504, 528 (S.D.N.Y. 1998) (Sotomayor, J.) (explaining the "requirement that the enterprise be 'engaged in commerce or in the production of goods for commerce'"). Upon satisfying the second prong by showing that the enterprise does the "requisite dollar volume of business," *i.e.*, $500,000 every year, the plaintiff is "virtually" guaranteed to satisfy the first prong, which, unlike the requirement for individual coverage, does not demand that he "himself . . . be involved in an activity which affects interstate commerce." *Archie*, 997 F. Supp. at 528, 530 (quotations omitted).

Here, however, it is undisputed that PAM served the local community of Mount Vernon, New York, and that Lominy's pediatric patients mainly lived in the local Mount Vernon

community or the local Westchester community.[84] It is also undisputed that PAM never had income or revenue more than $500,000.[85] Thus, the enterprise coverage does not apply here.

### 2.   Individual Coverage

For purposes of individual coverage, the plaintiff is an employee (i) "engaged in the production of goods for commerce," when he "handl [es] or otherwise work[s] on goods intended for shipment out of the State, directly or indirectly"; or (ii) otherwise "engaged in commerce," when he "perform[s] work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence) among the several States or between any State and any place outside thereof." 29 C.F.R. §§ 779.103, 779.104. The latter requires that the plaintiff work "in the channels" of "interstate or foreign commerce," or "in activities so closely related to this commerce, as to be considered a part of it," such as, "regular[ ] use [of] the mails, telephone or telegraph for interstate communication"; "regular[ ] travel across State lines while working." 29 C.F.R. § 779.103. Activities that simply "affect or indirectly relate to interstate commerce" are insufficient. *McLeod v. Threlkeld*, 319 U.S. 491, 497 (1943). "As a basic rule, if the plaintiff did not have any contact with out-of-state customers or businesses, he cannot be individually covered under the FLSA." *Jian Long Li*, 35 F. Supp. 3d at 308 (internal quotation marks and citations omitted).

Here, the parties do not dispute that Marcus did not "handl[e] or otherwise work[] on goods intended for shipment out of the State, directly or indirectly." 29 C.F.R. § 779.104; (*see also* Cross-Mot. at 28; Resp. in Opp'n at 25.) Instead, the parties only dispute whether Marcus was an employee "engaged in commerce." 29 C.F.R. § 779.103.

---

[84] (Lominy Decl. ¶ 11.)

[85] (*Id.*, Ex. 1 (PAM's tax returns).)

Marcus argues that he "engaged in commerce" to qualify for individual coverage under the FLSA because he (1) "ordered all [PAM] materials that were manufactured from locations outside New York State for use inside the State of New York"; (2) "interacted with computer consulting companies from outside New York State for the software program that operated [PAM]"; (3) "performed online banking services with national banks such as Chase, [Washington Mutual], and Capital One"; (4) "managed the construction of 88 West Lincoln (a related company to [PAM]), which included the purchasing of construction materials that were manufactured outside the State of New York"; and (5) "dealt with out of state insurance vendors to facilitate medical billing." (Resp. in Opp'n at 25–26.) He states that "[s]uch activities comprised approximately 75%-85% of [his] time" and that "[t]he [remaining] time was [for] dealing with computing employee payroll, scheduling, and dealing with client billing issues." (*Id.* at 26 (citing Marcus Decl. in Opp. ¶ 6.))

But Defendants contend that Marcus's "[b]are assertions of credit card use and use of the internet are insufficient to demonstrate interstate commerce for individual coverage." (Cross-Mot. 29.) In support, they cite to case law in which a medical assistant "whose duties included checking patients in and out of their appointments, verifying insurance coverage, answering the phone, filing, faxing and other clerical duties," did not sufficiently establish individual coverage by merely alleging "that she regularly used the telephone, internet, and facsimile machine to contact out of state insurance companies and process patients' credit card payments because she did not allege how much of her time was spent on such activities." (*Id.* (citing *Dent v. Giaimo*, 606 F. Supp. 2d 1357, 1361 (S.D. Fla. 2009).) They further contend that "to conclude otherwise would lead to untenable results" because "any employee who regularly uses a car or cellular phone for work, whether or not he engages with 'out-of-state customers or businesses,' would be covered under the FLSA." (*Id.* (citing *Jian Long Li*, 35 F. Supp. 3d at 309.)

After reviewing the record, the Court agrees with Defendants that Marcus fails to establish individual coverage under the FLSA. The record shows that the only evidence Marcus proffers to support his argument that he "engaged in commerce" are the assertions in the declaration he submitted in opposition to Defendants' cross-motion. But even when drawing all inferences in his favor, Marcus's bare assertions, such as that he ordered materials manufactured outside of New York, interacted with businesses outside of New York (including banks), and dealt with out-of-state insurance vendors, "are vague . . . [and] provide no information about the frequency of those contacts, and therefore cannot not support an assertion that a substantial part of [Marcus's] work closely relates to interstate commerce." *Jones v. SCO Fam. of Servs.*, 202 F. Supp. 3d 345, 351 (S.D.N.Y. 2016) (dismissing allegations of plaintiffs' individual coverage in an FLSA case on the same grounds); *Walker v. The Interfaith Nutrition Network, Inc.*, No. 14 CV 5419 DRH GRB, 2015 WL 4276174, at *4 (E.D.N.Y. July 14, 2015) (same).

In fact, unlike plaintiffs in other cases within and outside this Circuit, Marcus fails to specify the substance and purpose of these activities, the frequency of his interactions with, or the quantity of purchases from out-of-state vendors such that the Court could conclude that his activities were regular and recurrent, and not just sporadic or occasional. *Compare Lopez v. Pereyra*, No. 09-60734-CIV, 2010 WL 335638, at *6 (S.D. Fla. Jan. 29, 2010) (denying summary judgment against plaintiff on individual coverage issue because plaintiff filed declaration asserting that she made weekly telephone calls to patients located in the Dominican Republic; contacted insurance companies outside of Florida at least three times each work day; mailed twelve to twenty-five billing and other insurance forms to insurance companies outside Florida, among other tasks); *Boekemeier v. Fourth Universalist Soc'y in City of New York,* 86 F. Supp. 2d 280, 287 (S.D.N.Y. 2000) (granting summary judgment in favor of plaintiff on individual coverage issue

because the parties stipulated to documentary evidence indicating that plaintiff made between fourteen and thirty purchases from five different out-of-state vendors) *with Dent*, 606 F. Supp. 2d at 1361 (granting summary judgment against plaintiff on individual coverage issue despite plaintiff averring "that about 70% of defendant's patients [were] not Florida residents, that she regularly used the telephone, internet and facsimile machine to contact out of state insurance companies, and that she processed patients' credit card payments.").

Additionally, that Marcus "may have regularly worked with goods that originated from outside of New York does not qualify him as an employee engaged in commerce." *Yupa v. Country Stone & Fence Corp.*, No 14-CV-7384 (DRH), 2017 WL 27957 at *4 (E.D.N.Y. Jan. 3, 2017) (finding no individual coverage where plaintiff produced and installed backyard furniture from goods that originated outside New York). And finally, the Court agrees with Defendants that Marcus's activities relating to his phone and online use "at best, 'affect or indirectly relate to interstate commerce.'" *McLeod*, 319 U.S. at 497. "To conclude otherwise would lead to untenable results . . . [as] [i]t is difficult to imagine anyone, in this modern day and age, who does not meet this definition." *Jian Long Li*, 35 F. Supp. 3d at 309. Therefore, the Court concludes that Marcus fails to adduce sufficient evidence to establish that he has individual coverage under the FLSA.

C.      *Third Prong – Exempted Employees*[86]

Employees may be exempt from overtime and minimum wage provisions if they are "employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited by the regulations of the Secretary [of Labor]." 29 U.S.C. § 213(a)(1); *see also* NYLL § 651(5). Whether an exception applies to the FLSA is an affirmative defense on which

---

[86] As mentioned above, because the NYLL provisions are "substantially similar to the federal scheme," the Court's ensuing analysis of federal law would apply equally to Marcus's claims under the FLSA and NYLL. *Debejian*, 64 F. Supp. 2d at 87, n.1.

the employer has the burden of proof. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 197 (1974); *Freeman v. National Broad. Co., Inc.*, 80 F.3d 78, 82 (2d Cir. 1996). The exemptions are narrowly construed and the employer must show that the employee fits "plainly and unmistakably within [the exception's] terms." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960). An employee qualifies for such an exemption if he satisfies a "duties" test and is paid on a "salary basis." *See* 29 C.F.R. §§ 541.100 (Executive); 541.200 (Administrative); *see also Kelly v. City of Mount Vernon*, 162 F.3d 765, 766 (2d Cir. 1998).

### 1.   Administrative Exemption

The definition of an administrative employee includes any employee: (1) compensated on a salary or fee basis at a rate of not less than $455[87] per week; (2) whose primary duty is the performance of office or non-manual work directly relate to the management or general business operations of the employer or the employer's customers; and (3) whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. *See Schwartz v. City of New York*, No. 19 CIV. 5204 (JPC), 2021 WL 4392051, at *7 (S.D.N.Y. Sept. 24, 2021) (citing 29 C.F.R. § 541.200). "The distinction between administrative work and production work separates 'those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services that the enterprise exists to produce and market.'" *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 705 (S.D.N.Y. 2005) (citations omitted).

---

[87] From 2004 to 2019, the FLSA salary test required that exempt employees be compensated on a salary basis at a rate of not less than $455 per week. *Smith v. Wall St. Gold Buyers Corp.*, No. 18CV6836DRHARL, 2021 WL 4711730, at *4 (E.D.N.Y. Sept. 20, 2021), *report and recommendation adopted*, No. 18CV6836DRHARL, 2021 WL 4711698 (E.D.N.Y. Oct. 8, 2021).

Here, the record first indisputably shows that Marcus received weekly wages of at least $600 from late 2007 through December 2015,[88] and well above the $455 per week threshold beginning December 2015 through July 1, 2016, when Marcus reported to ADP that his wages had increased to $75 per hour.[89] Additionally, it is undisputed that Marcus "received compensation" in the form of "profit-sharing," which he testified to having determined based on availability, feasibility, and the money available.[90] *See Seltzer v. Dresdner Kleinwort Wasserstein, Inc.*, 356 F. Supp. 2d 288, 301 (S.D.N.Y. 2005) (considering plaintiff's base salary combined with her annual bonus in determining whether she met the salary threshold for the administrative exemption). Hence, considering his weekly wages by themselves, or even in combination with his "profit-sharing compensation," Marcus indisputably surpasses the weekly salary threshold for the administrative exemption.

Further, the record indisputably shows that Marcus's primary duties directly related to the management and business operations of PAM,[91] including processing the medical bills,[92] paying employees and himself,[93] paying the rent and bills, ordering supplies, and handling the cash flow and finances.[94] And finally, the record also indisputably shows that Marcus's role as PAM's office manager involved the exercise of discretion and independent judgment with respect to matters of significance. Particularly, Marcus himself included the following activities in the purported job

---

[88] (*See* SUMF ¶ 17; RCSUMF ¶ 17; Marcus Decl., Ex. 9 at 2–6.)

[89] (Marcus Decl., Ex. 9 at 6–9.)

[90] (Marcus Dep. Tr. at 116:15–117:25; *see also id.* at 124:2–4 (testifying that he took approximately between $40,000 and $60,000 per year from his "profit-sharing" compensation.)

[91] (*Id.* at 82:14–19.)

[92] (*Id.* at 85:7–86:2.)

[93] (*Id.* at 83:5–25, 112:7–16, 169:12–22, 171:4–24.)

[94] (*Id.* at 86:24–87:21.)

description he prepared and proffered in support of his own motion: strategic planning and implementation; cost reduction; crisis management; managing accounts payable; processing all financial reports; budget administration; management of internal systems and controls; and team building and leadership.[95] Therefore, the Court concludes that Marcus is exempt from the FLSA and NYLL minimum wage and overtime requirements based on the administrative exemption.

2.    Executive Exemption

On a similar basis, the Court also concludes that Marcus is exempt from the FLSA and NYLL minimum wage and overtime requirements based on the executive exemption. The definition of an executive employee includes any employee that (1) is paid on a salary basis of at least $455[96] per week; (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) customarily and regularly directs the work of two or more other employees; and (4) has the authority to hire and fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight. *See Veracka v. MLD Mortg. Inc.*, No. 16CV7152WFKAYS, 2021 WL 2662007, at *6 (E.D.N.Y. Apr. 1, 2021) (citing 29 C.F.R. § 541.100(a)). As previously discussed above, the record indisputably shows that Marcus surpasses the weekly salary threshold. Further, the record indisputably shows that Marcus responsibilities at PAM also meet the second, third, and fourth prongs of § 541.100(a). Indeed, throughout the record, Marcus has described himself as both a "founder" [97] and "Administrator" [98] of PAM.

---

[95] (Marcus Decl., Ex. 8.)

[96] *See supra* note 87.

[97] (Marcus Decl., Ex. 6 (Meeting Minutes containing remark that Marcus was a "founder/manager.")

[98] (*Id.* at 108:17–109:21; Lominy Decl., Ex. 2, ECF No. 96-2.)

Therefore, the Court grants summary judgment against Marcus's claims under the FLSA and NYLL for minimum wage and overtime.

D.      *Failure to Pay Wages under NYLL §§ 190 and 191.*

Marcus finally claims that Defendants failed to pay him wages for hours he allegedly worked, in violation of NYLL §§ 190 and 191. (*See* Compl. at 5, ¶¶ 72–76.) Specifically, Marcus contends that Defendants only paid him $300 (for 20 hours) instead of $600 (for 40 hours) per week from his "start with [PAM] through December 1, 2015." (Mot. at 30.)

But "[s]ection 190 is a definition section, and most courts have held that nothing in that section serves to create a viable cause of action." *Albertin v. Nathan Littauer Hosp. & Nursing Home*, 537 F. Supp. 3d 243, 266 (N.D.N.Y. 2021) (citing *Jensen v. AR Glob. Invs., LLC*, 2020 WL 1322584, at *5 (S.D.N.Y. Mar. 20, 2020) (collecting cases)). "However, [section] 191 is a different and much more complicated matter. In fact, there is an active split within this Circuit as to whether that section affords plaintiffs a cause of action." *Id.* (citing *Sorto v. Diversified Maint. Sys., LLC*, 2020 WL 8413553, at *2 (E.D.N.Y. Nov. 15, 2020).

Here, neither party adequately briefed such issue. Notwithstanding, the Court need not engage in the debate because, to the extent that these statutes create a viable cause of action, Marcus has failed to adduce any evidence that Defendants "failed to pay [him] in the schedule that statute imposes for clerical workers, the best fit for [Marcus's] role at [PAM]." *Id.* (citing § 191(d) (requiring advance notice of pay schedule for clerical workers and requiring payment on at least semi-monthly basis). If anything, the parties do not dispute that Marcus received at least $600 per week in wages.[99] And moreover, to the extent that the Court could consider the "profit-sharing compensation" Marcus "received" from PAM[100] in its calculation of weekly wages, as an

---

[99] (*See* SUMF ¶ 17; Marcus Decl., Ex. 9 at 2–6.)

employee "earning more than $900 a week ([NYLL] § 190 (7)), [Marcus] is 'expressly excluded' from the protections of [NYLL] § 191." *Eden v. St. Luke's-Roosevelt Hosp. Ctr.*, 947 N.Y.S.2d 457, 459 (1st Dep't 2012) (citing *Pachter v. Bernard Hodes Group, Inc.*, 10 N.Y.3d 609, 616 (N.Y. 2008)). Therefore, the Court dismisses Marcus's claims under NYLL §§ 190 and 191.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' cross-motion for summary judgment and DENIES Plaintiff's motion for summary judgment. Hence, the only claims remaining in this action include Plaintiff's claims for retaliation, and Defendants' counterclaims for unjust enrichment and breaches of fiduciary duty and duty of loyalty.[101] For purposes of scheduling a bench trial,[102] the parties are directed to appear for a telephonic pre-trial conference on May 3, 2022, at 10:00 a.m. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest. Should the parties wish to engage in settlement discussions, they must contact Magistrate Judge Andrew E. Krause prior to the telephonic pre-trial conference. The Clerk of Court is directed to terminate the motions at ECF Nos. 92 and 99.

Dated: February 16, 2022
White Plains, NY

SO ORDERED:

NELSON S. ROMÁN
United States District Judge

---

[100] (Marcus Dep. Tr. at 116:15–117:25; *see also id.* at 124:2–4 (testifying that he took approximately between $40,000 and $60,000 per year from his "profit-sharing" compensation.) Thus, for example, assuming Marcus "received" $40,000 (the lowest amount he reported) in "profit-sharing compensation," and the Court were to divide that amount by 52 weeks, and then add the $600 weekly wage he received, Marcus would have approximately received $1,369.00 per week in compensation.

[101] As mentioned above, the parties did not move for summary judgment on any of these remaining claims.

[102] (*See* Revised Civil Case Discovery Plan and Scheduling Order at 1, ECF No. 61.)